INTRATEX GAS COMPANY, Appellant,

v.

Roberta PUCKETT, Individually and as Independent Executrix of the Estate of Don Puckett, et al., Appellees.

No. 08–93–00187–CV.

Court of Appeals of Texas, El Paso.

July 21, 1994.

Samuel Downing McDaniel, Austin, for appellant.

Tom Scott, Dale Strauss, Bullock, Scott, Neisig & Owens, Midland, for appellees.

Before BARAJAS, C.J., and KOEHLER and LARSEN, JJ.

## OPINION

LARSEN, Justice.

This appeal concerns the price appellant Intratex should have paid appellees, members of the Puckett family, for natural gas under a purchase contract entered in 1974. In addition, both sides to the controversy claim a reimbursement is due from the other under unrelated theories. After a bench trial, the trial court entered judgment for the Pucketts, finding they were due sums under the contract, including an amount calculated as reimbursement for severance taxes. The trial court found that Intratex was due nothing as a refund for overpayments made under an administrative payment scheme later

rejected by the federal courts. Intratex appeals.

## FACTS

In March 1974, members of the Puckett family entered into a contract with Intratex Gas Company to sell natural gas from three oil and gas leases in Pecos County, Texas.[1] The contract prohibited resale of gas outside the State of Texas. It provided for an initial price per million Btu's [2] of 90¢. The contract also contained certain clauses for calculating subsequent prices, which are the subject of this controversy: variations of these provisions are common in contracts for the sale of natural gas. The first is known in the industry as an "FPC (Federal Power Commission) [3] clause" or "area rate clause":

> If at any time or from time to time during the term of this Contract, the Federal Power Commission, or any successor governmental authority having jurisdiction in the premises, shall allow, by final order following hearing, or by settlement, for the area in which the Gas reserves are situated and for which Seller would qualify, higher unconditional rates under long-term gas purchase contracts for natural gas of the contract vintage and quality (including upward and downward BTU adjustment and other applicable and appropriate factors) of the Gas involved herein than the price herein then provided to be paid, then the price to be paid by Buyer to Seller for Gas which has been delivered under the provisions of this Agreement since the date of said order shall be increased to equal such higher rate, and shall be thereafter continued until a further higher price is provided under this or any other provision of this Paragraph 4.

The second clause is known as a "redetermination clause" or "indefinite price escalator clause":

The price to be paid by Buyer for Seller's gas will be redetermined March 1, 1975, and each succeeding March 1 during the term of this Agreement. The period of twelve consecutive months from each redetermination date to the next redetermination date shall constitute a contract year. Such redetermined price shall become effective as of the first day of the contract year for which it is determined. The redetermined price shall be computed by taking the average (rounded off to the nearest tenth of a cent) of the two (2) highest prices per MCF for gas being paid by any pipeline company to any producer under a contract whose original term is three (3) years or longer, for the purchase in Texas Railroad Commission Districts 8 and 7–C of gas of a pressure and quality similar to that available hereunder; provided, however, any price being paid by an interstate pipeline company will not be used hereunder to the extent that such price is suspended or subject to refund at the time of such redetermination, and further provided that said price shall never be less than the price being paid pursuant to this Agreement at the time of such redetermination.

In 1978, Congress passed the Natural Gas Policy Act (NGPA), 15 U.S.C. §§ 3301 et seq. (1988 and Supp. IV 1992). This Act for the first time brought intrastate natural gas sales under federal regulation.[4] Among other things, the NGPA set maximum price ceilings for intrastate gas sales. The Pucketts and Intratex negotiated to arrive at the appropriate price under the contract, but reached no agreement. In 1984 the Pucketts filed this action asking for declaratory judgment of the price due them under the gas purchase contract following passage of the NGPA. They claimed that their FPC clause mandated a higher price for their gas than

1. The contract was for a period from March 1, 1974 until April 28, 1990, renewable year-to-year after that.

2. Natural gas is measured in British Thermal Units (Btu's). One Btu is the amount of energy needed to raise the temperature of one pound of water by one degree Fahrenheit. Gas is commonly priced per million Btu's, notated as MMBtu's.

3. The Federal Power Commission was replaced by the Federal Energy Regulation Commission (FERC) after passage of the Natural Gas Policy Act in 1978.

4. The NGPA was repealed effective January 1, 1993.

Intratex would agree to pay. They also claimed that the phrase "including upward and downward BTU adjustment and other applicable and appropriate factors ..." to be considered in determining a "higher price" under the FPC clause included reimbursement for Texas severance taxes they had been paying, which Intratex disputed.

The Honorable Pat Baskin held a bench trial on the suit in 1985. The judge permitted Intratex to file its trial amendment requesting reimbursement from the Pucketts for alleged overpayments Intratex made using the Federal Energy Regulatory Commission's (FERC's) then-sanctioned "dry" rule for measuring gas, a method which was retroactively rescinded in favor of a "wet" rule, resulting in a lower Btu count and therefore lowered prices. For reasons unexplained in the record, judgment was not entered in the cause until March 1993. The trial court there held the following:

> The price to be paid to the Plaintiffs herein under the contract at issue [was] the escalating NGPA price;
>
> The Plaintiffs were entitled to reimbursement of severance taxes;
>
> Plaintiffs [were] entitled to recover prejudgment interest ...;
>
> The affidavit regarding attorney's fees filed herein on February 10, 1993 correctly states testimony taken at trial which testimony forms the basis for the award of attorney's fees made herein.

The trial court ordered that the Pucketts recover from Intratex these amounts:

> The difference between the price of gas paid by Intratex to the Plaintiffs and the amount owed—being $45,845.88;
>
> The amount of severance taxes—being $90,587.85;
>
> Prejudgment interest on the Underpayments in the amount of $30,874.31;
>
> Prejudgment interest on the Severance Taxes in the amount of $65,021.90;
>
> Post-judgment interest as provided by law; and
>
> Attorneys fees.

The trial court declined to grant Intratex any relief on its trial amendment for payments made under the dry rule.

In its findings of fact and conclusions of law, the trial court found that the gas sales at issue were intrastate sales subject to the Natural Gas Act and Natural Gas Policy Act of 1978. It found that at the contract date, the unregulated price for intrastate gas was much more than the federally regulated price for gas sold in interstate commerce; for that reason, the Pucketts wished to avoid allowing their gas to be sold in interstate commerce. At the time the sales contract was entered, natural gas sellers were apprehensive of imminent federal regulation of gas in the intrastate market. Thus, the Pucketts included the FPC clause in the contract to assure that they would receive the highest lawful price for their gas if intrastate gas became regulated. The trial court concluded that the FPC clause's terms "higher rate" and "higher price" were intended to allow the maximum ceiling price for gas contemplated in the NGPA. The court also concluded that those terms included reimbursement for severance taxes paid by the Pucketts, and that the contract contained no provision prohibiting reimbursement of severance taxes paid by Plaintiffs. The court found that Intratex had not paid the escalating NGPA price, and owed the difference between the price paid and the higher price owed under the contract including reimbursement for severance taxes. Intratex appealed.

## CONSTRUCTION OF THE CONTRACT

■ Both parties agree that the contract is unambiguous. When parties disagree over the meaning of an unambiguous contract, its interpretation is a matter of law for the court. *Edwards v. Lone Star Gas Co., A Division of Enserch Corp.*, 782 S.W.2d 840, 841 (Tex.1990); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *First City National Bank of Midland v. Concord Oil Co.*, 808 S.W.2d 133, 137 (Tex.App.—El Paso 1991, no writ). In construing the contract, the court must attempt to harmonize and give effect to all provisions of the contract, so that none is rendered meaningless. *Coker*, 650 S.W.2d at 393.

■ In construing an unambiguous contract, the parties' intent must be taken from

the agreement itself, not the parties' present interpretation, and the court must enforce the unambiguous contract as written. *Id.* Beyond the four corners of the parties' agreement, their intent may be evidenced from the surrounding facts and circumstances when the contract was entered. *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 731–32 (Tex.1981). The court may consider the commercial context of the transaction:

> [Contracts] should be construed and given effect in terms of their environment at the time of execution. By environment we mean the ordinary terms, customs and usages then in effect as these are evidence of the intent of the parties. *Atwood v. Rodman,* 355 S.W.2d 206, 216 (Tex.Civ.App.—El Paso 1962, writ ref'd n.r.e.).

■ Legal conclusions by the trial court are given no particular deference on appeal; rather, the appellate court has the power and duty to independently evaluate the legal underpinnings of a judgment. *Sears, Roebuck and Co. v. Nichols,* 819 S.W.2d 900, 903 (Tex.App.—Houston [14th Dist.] 1991, writ denied). With these standards in mind, we examine Intratex's points of error.

### *"HIGHER PRICE" AND "HIGHER RATE" UNDER THE CONTRACT AND THE NGPA*

■ In Points of Error One, Two, and Three, Intratex urges that the trial court erred in finding that Intratex had not paid the Pucketts the price they were due under the contract following passage of the Natural Gas Policy Act of 1978. Point of Error One claims that as a matter of law, the contract could not support judgment for the Pucketts. Points of Error Two and Three claim that legally and factually insufficient evidence supported the trial court's findings of fact eleven and twelve, which state, respectively, that:

> In the commercial context within which the Contract was negotiated, the purpose and intent of the [FPC] clause ... was to assure that Plaintiffs, as sellers, would receive the highest lawful price for the natu-ral gas if intrastate gas was subjected to regulation.

And:

> The terms "higher rate" and "higher price" as used in the [FPC clause] incorporates the ongoing ceiling price for gas utilized in the Natural Gas Policy Act of 1978.

We believe the trial court correctly analyzed the contract and evidence in this case, and conclude that it committed no error in finding that Intratex owed the Pucketts for amounts due under the escalating NGPA price.

The evidence at trial included extensive expert testimony on the commercial context of the transaction between these parties. Dr. Diana Olien, an oil and gas industry historian testifying for the Pucketts, stated that during the years surrounding this contract's execution, the energy industry anticipated federal regulation of the intrastate gas market. Monroe Smith, another expert for the Pucketts, testified that gas producers were very concerned during this period with potential federal regulation of intrastate gas. During this time, unregulated intrastate deals were much more lucrative than regulated interstate sales of gas. Intratex's own expert, James Hazzlerigg, testified that the purpose of the FPC clause was to insure that when and if intrastate gas sales were subjected to federal regulation, the producer would receive the highest price allowed under any new regulation:

Q: Well, would you agree with Mr. Smith that from the purchaser's standpoint the worst thing that he thought might happen to his gas is that it might become regulated, isn't that a fair statement, from the producer's standpoint?

A: Probably.

Q: And he wanted to protect the higher price he was receiving for his intrastate gas from such regulations, wasn't that a concern there?

A: Obviously.

Q: And so it would be logical, would it not, for a natural gas producer to want to provide that in the event his intrastate gas got regulated that he could

receive whatever the highest lawful price would be for that gas and for which he would qualify, however, it might be required to qualify?

A: I think that is why the FPC clause is inserted in the contract, yes.

Q: Obviously Intratex had no objection to the insertion of such a clause, did they?

A: Correct.

We conclude there was ample evidence before the trial court to sustain its findings of fact eleven and twelve, both factually and legally.

Intratex next makes several technical arguments as to which section of the NGPA applied in setting the contract price here. First, it claims that the trial court wrongly classified the vintage of gas produced from the Pucketts' wells treating it as new gas (triggering the price set by § 102), instead of properly designating it as old gas (triggering the price set by § 105). Section 102 of the NGPA reads:

**Sec. 102. Ceiling price for new natural gas and certain natural gas produced from the outer continental shelf.**

(a) Application. The maximum lawful price computed under subsection (b) shall apply to any first sale of natural gas delivered during any month in the case of—

(1) new natural gas; and

(2) natural gas produced from any old lease on the Outer Continental Shelf and qualifying under subsection (d) for the new natural gas ceiling price.

(b) Maximum lawful price. The maximum lawful price under this section for any month shall be—

(1) $1.75 per million Btu's, in the case of April 1977; and

(2) in the case of any month thereafter, the maximum lawful price, per million Btu's, prescribed under this subsection for the preceding month multiplied by the monthly equivalent of a factor equal to the sum of—

(A) the annual inflation adjustment factor applicable for such month; plus

(B)(i) .035, in the case of any month beginning before April 20, 1981; or

(ii) .04, in the case of any month beginning after April 20, 1981. 15 U.S.C. § 3312.

Section 105 reads:

**Sec. 105. Ceiling price for sales under existing intrastate contracts.**

(a) Application. The maximum lawful price computed under subsection (b) shall apply to any first sale of natural gas delivered during any month in the case of natural gas, sold under any existing contract or any successor to an existing contact, which was not committed or dedicated to interstate commerce on the day before the date of the enactment of this Act.

(b) Maximum lawful price.

(1) General rule.—Subject to paragraphs (2) and (3), the maximum lawful price under this section shall be the lower of—

(A) the price under the terms of the existing contract, to which such natural gas was subject on [November 9, 1978], as such contract was in effect on such date; or

(B) the maximum lawful price, per million Btu's, computed for such month under section 3312 [§ 102 of this title] (relating to new natural gas). 15 U.S.C. § 3315.

We think Intratex's argument, although canny, is inapplicable here. First, we note the testimony of Mr. Monroe Smith, the Pucketts' expert, indicated that vintaging [5] was not a concept applicable to intrastate gas when this contract was entered. More importantly, we think the trial court properly concluded that the FPC clause in this agreement was intended to provide the sellers with the highest legal price should regulation occur; contrary to Intratex's interpretation of the judgment here, that price was actually triggered by § 105(b)(1)(B). That section clearly applies to contracts in existence in

5. That is, classifying gas as "new" or "old" depending upon when a contract was entered (con-

tract vintaging), or when a well was drilled (well vintaging).

November 1978, does not otherwise distinguish between new and old gas, and adopts § 102's price by reference. We therefore reject Intratex's argument that the Pucketts have improperly received higher new gas prices for old gas.

■ Next, Intratex argues that the FPC clause could only be triggered by NGPA § 104, which set the maximum price for natural gas sold in interstate commerce:

**Sec. 104. Ceiling price for sales of natural gas dedicated to interstate commerce.**

(a) Application. In the case of natural gas committed or dedicated to interstate commerce on the day before the date of the enactment of this Act and for which a just and reasonable rate under the Natural Gas Act was in effect on such date for the first sale of such natural gas, the maximum lawful price computed under subsection (b) shall apply to any first sale of such natural gas delivered during any month. 15 U.S.C. § 3314.

This argument fails because the Intratex–Puckett contract specifically limited sale of its subject gas to intrastate commerce. Section 104 is not applicable.

■ Intratex argues that the price it paid was the lawful price authorized by NGPA § 105(b). That section of the NGPA sets ceiling prices for intrastate contracts in existence on November 8, 1978.

Intratex claims that the stipulations between the parties support its position that § 105(b)(1)(A), not the § 102 price set out in § 105(b)(1)(B), applied to this contract. Those stipulations were: (1) all the wells subject to the contract were completed before 1978; (2) On December 9, 1978, the price paid for gas under the contract was below the price set by § 102. Thus, Intratex argues, the contract price on that date was the lower of the two prices contemplated by § 105, and was therefore the price due the Pucketts under the contract.

The Pucketts, on the other hand, urge they were entitled to the higher payments set by § 102 of the NGPA, triggered by § 105(b)(1)(B). Although the contract price

in March 1978 was $2.048, they argue the FPC provision was triggered in November of 1978 when the NGPA became effective and at that point they were entitled to the new § 102 price of $2.078 by virtue of their FPC clause, with monthly escalations under the Act thereafter. We find the Pucketts' position persuasive. Moreover, we are further persuaded by the argument that adopting Intratex's theory that § 105 set the price would render the contract's FPC clause meaningless, forever avoiding the need for Intratex to pay a new, higher price, a result we are required to avoid.

■ The law allows for price escalations if they are agreed to between the parties. *Enserch Corp. v. Houston Oil & Minerals Corp.*, 743 S.W.2d 654, 656 (Tex.App.—Houston [1st Dist.] 1987, writ denied). The trial court properly found that "higher price" and "higher rate" under the FPC clause incorporated monthly escalations under § 102 for the reasons discussed above.

Finally, Intratex urges that we should not uphold the trial court's judgment on the Pucketts' alternative theory that the § 102 price is triggered by the redetermination clause, if not by the FPC clause. Because we find that the FPC clause supports the trial court's finding that § 102 applies, we need not reach this argument. Points of Error One, Two, and Three are overruled.

### REIMBURSEMENT FOR SEVERANCE TAXES

■ In its Points of Error Four and Five, Intratex urges that the trial court erred in awarding the Pucketts reimbursement for their payment of severance taxes. In Point of Error Four, Intratex claims there is legally and factually insufficient evidence to support the trial court's finding that "[t]he term 'higher rate' and 'higher price' … includes the reimbursement for severance taxes authorized by the Natural Gas Policy Act of 1978." In Point of Error Five, Intratex urges that the contract, as a matter of law, did not obligate Intratex to reimburse the Pucketts for severance taxes paid. We disagree with both assertions.

In Texas, a severance tax on natural gas is payable by the producer, unless the purchaser takes delivery of the gas on the premises where it is produced, or unless the parties otherwise agree. TEX.TAX CODE ANN. §§ 201.051, 201.204, 201.2041, and 201.251 (Vernon 1992). The contract at issue here is silent as to any tax obligations for the gas delivered by the producer to the purchaser. It does provide that the "point of delivery for all gas to be purchased hereunder shall be at the inlet flange of Buyer's existing meter station installed to receive gas under the Contract," that is, off premises from where the gas is produced. It also provides that "upward and downward Btu adjustment and other *applicable and appropriate factors*" [emphasis added] shall be considered in determining whether a price higher than the contract price is to be paid under the FPC clause. The NGPA allows producers to exceed the otherwise maximum lawful price for gas "to the extent necessary to recover ... state severance taxes....." NGPA § 110(a)(1), 15 U.S.C. § 3320(a)(1). See also *Enron Oil and Gas Co. v. Lujan,* 978 F.2d 212, 215–16 (5th Cir.1992).

In determining that the Pucketts were entitled to reimbursement for severance taxes, the trial court apparently relied upon the testimony of the Pucketts' expert witness, Charles Kuss. Mr. Kuss testified as to market conditions and industry standards at the time the parties entered this contract:

Q: [The contract] says, 'Including upward and downward Btu adjustment and other applicable and appropriate factors,' do you see that?

A: Yes.

Q: Tell me whether or not a tax reimbursement is permitted under Section 102 of the NGPA, in addition to the maximum lawful price as set by the NGPA?

A: Yes, FERC does allow the payment of taxes on top of these published maximum lawful prices.

Q: Are you aware of any instances where contracts using the language in parentheses here 'Including upward and downward Btu adjustment and other applicable and appropriate factors,' has re-sulted in a tax reimbursement being triggered by virtue of the NGPA coming into existence?

A: I'm familiar with contracts where taxes are being paid under an area rate type condition.

[objection and discussion omitted]

Q: Mr. Kuss, referring to the same language in the bracketed material in the contract, do you have an opinion within your experience and background as to whether or not the words 'Including upward and downward Btu adjustment and other applicable and appropriate factors' have a meaning within the industry that relates to tax reimbursement?

[objection omitted]

Q: Do you have an opinion as to whether those words have a commonly accepted meaning within the industry?

A: I would interpret those words to mean—

[objection omitted]

Q: Mr. Kuss, I'm not asking you to give me your opinion of what the words mean in this contract. I'm only asking you to give me your opinion as to whether or not these words are commonly accepted within the industry to have certain meanings, and that's a yes or no question.

A: Yes.

. . .

Q: Have you seen instances within your experience where those words resulted in triggering the payment of tax reimbursements once the NGPA came in?

[objection omitted]

A: I cannot testify as to those exact words, but I can testify that under FPC clauses, area rate clauses in general, I have seen instances where taxes were paid on top of those rates when the contract itself was silent to taxes in other areas.

In a bench trial, the trial judge is the fact finder, passing on the credibility of witnesses and the weight to be given their testimony. *Texas West Oil & Gas Corp. v. El Paso Gas Transportation Co.,* 631 S.W.2d 521, 524 (Tex.App.—El Paso 1982, writ ref'd n.r.e.).

Even where this Court might reach a different conclusion when faced with the same facts, we are not permitted to substitute our judgment for that of the trial court on factual determinations. *Id.* Here, the trial court's conclusion that the terms "higher price" and "higher rate" included reimbursement for severance taxes is supported by Kuss's testimony on commonly accepted meanings within the industry and the contract language itself. There is some evidence supporting the finding, thus defeating Intratex's legal sufficiency challenge. Likewise, we find that the trial court's finding is not against the great weight and preponderance of the evidence. Point of Error Four is overruled.

In arguing that the contract cannot support reimbursement of severance taxes as a matter of law, Intratex relies upon two cases: *Edwards v. Lone Star Gas Co., A Division of Enserch Corp.,* 782 S.W.2d 840, 841 (Tex. 1990) and *Enserch Corp. v. Houston Oil & Minerals Corp.,* 743 S.W.2d 654, 657 (Tex. App.—Houston [1st Dist.] 1987, writ denied). We think the contract clauses which led those courts to conclude that severance tax reimbursements were not to be included in price escalations are clearly distinguishable from the contract before us here. In both *Edwards* and *Enserch,* the contracts contained specific language imposing liability for severance taxes upon the gas sellers. Thus, those contracts were not open to the interpretation that "applicable and appropriate factors" included reimbursing gas producers for severance taxes in calculating the "higher price" triggered by FPC clauses following passage of the NGPA. The contract here, however, is silent as to obligations for severance taxes; no specific contract language precludes severance tax reimbursement and we cannot say that the contract prohibits including those amounts in the "higher price" calculation as a matter of law. We conclude that the trial court did not err in entering judgment for the "higher price" under the contract which included reimbursement for severance taxes. Point of Error Five is overruled.

### ATTORNEYS FEES

Intratex's Point of Error Six challenges the trial court's award of attorney's fees, solely on the basis that the Pucketts are not entitled to recover under the contract. The parties stipulated the amount of the Pucketts' reasonable and necessary attorney's fees. Having determined that the trial court did not err in entering judgment for the Pucketts on their contract, there remains no basis for overruling the trial court's award of attorney's fees. Point of Error Six is overruled.

### INTRATEX'S CLAIM FOR REIMBURSEMENT

Intratex, in its final point of error labelled cross-point, challenges the trial court's refusal to grant judgment for amounts it paid the Pucketts under FERC Orders 93 and 93a, in effect between 1978 and 1983, which specified that natural gas be measured under the "dry" rather than "wet" rule.[6] The wet rule for measuring natural gas had been the standardized, widely accepted industry method of measuring Btu content from 1961 until 1978. By order effective December 1, 1978, however, the FERC stated that the maximum lawful price for gas under the NGPA applied to "the Btu's actually delivered in that first

---

6. Although natural gas is primarily composed of combustible hydrocarbons, it contains a small (and varying) amount of non-combustible substances, including water vapor. Because water vapor does not create heat energy, and because the presence of water vapor in gas displaces energy-producing hydrocarbons, the more water vapor natural gas contains the lower its measured Btu value will be.

In 1961, the FPC mandated that Btu's be measured after saturating a test volume of gas with water vapor at a specified temperature and pressure. (1.0 cubic foot of gas measured at 60 degrees F. and 30 inches of mercury). This is called the "wet" rule because the gas sample is saturated with water vapor at a temperature and pressure under which it will absorb more moisture than it will in conditions under which most natural gas is sold. Thus, because the water vapor displaces flammable gases, the "wet" rule causes an understatement of the actual Btu's found in gas under market conditions. See *Interstate Natural Gas Assoc. of America v. Federal Energy Regulatory Comm'n,* 716 F.2d 1, 4–5 (D.C.Cir.1983).

The "dry" rule, in contrast, allows Btu content to be measured on an "as delivered" basis. The dry rule thus results in higher payments to gas producers from buyers. *Id.*

sale." FERC Order 93. That is, the FERC (apparently much to the surprise of the natural gas industry) adopted the dry rule for measuring natural gas prices under the NGPA, resulting in a higher measured Btu content for any given volume of gas, and thus a higher price. In 1983, however, the U.S. Circuit Court for the District of Columbia vacated the dry rule in *Interstate Natural Gas Association of America v. Federal Energy Regulatory Comm'n*, 716 F.2d 1 (D.C.Cir. 1983), cert. denied, 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 144 (1984), finding it "to be inconsistent with the NGPA's language, structure, and legislative history." *Id.* at 14–5. That Court retroactively reinstated the wet rule, so all natural gas buyers who had relied upon the dry rule between 1978 and 1983 in calculating gas prices were owed refunds from their producers. See FERC Order 399; *Houston Pipe Line Co. v. BHP Petroleum (Americas), Inc.*, 785 S.W.2d 398, 401 (Tex.App.—Houston [14th Dist.] 1988, writ denied). Those buyers claiming they were due reimbursement included Intratex. Because the maximum legal price under the redetermination clause in this contract escalated monthly, however, the amount Intratex owed the Pucketts under NPGA, although based upon the dry rule, was still less in most months than the amounts it owed as the "higher price" under the contract and NGPA § 102. The Pucketts' expert witness, Mr. Kuss, took overpayments under the dry rule into account in calculating the Pucketts' contract damages. The trial court adopted Mr. Kuss's calculations computed the amounts due accordingly. No error is shown and we overrule Intratex's last point of error labelled cross-point.

## CONCLUSION

Appellants have shown no error in the judgment of the trial court. We affirm it in all aspects.