**Michael E. HOLLOMON, Plaintiff,**

v.

**O. MUSTAD & SONS (USA), INC., Defendant.**

**No. Civ.A. 1:00–CV–298.**

United States District Court, E.D. Texas, Beaumont Division.

March 22, 2002.

Carl A. Parker, Parker & Parks, Port Arthur, TX, Edward W. Goldstein, John T. Polasek, Goldstein & Healey, Houston, TX, for Plaintiff.

Gregory M. Hasley, John Francis Luman, III, Akin, Gump, Strauss, Hauer & Feld, Houton, TX, J. Thad Heartfield, Jr., Heartfield & McGinnis, Beaumont, TX, for Defendant.

## MEMORANDUM OPINION

COBB, District Judge.

Before the court is Defendant's Motion for Summary Judgment [Dkt. # 57], and the court having reviewed the motion and responses on file and having heard oral arguments on said motion is of the opinion that the motion be GRANTED in PART and DENIED in PART.

This is a fish hook case. The parties entered into two agreements regarding the manufacture and sale of hooks designed by the plaintiff. After several years of operating under the two agreements, the parties had a falling out, and the plaintiff filed suit against the defendant for actions allegedly taken by the defendant after the agreements had been terminated. The de-

fendant has filed a motion for summary judgment.

## Factual Background

The plaintiff, Michael Hollomon (Hollomon), designs and produces fish hooks. In 1992, Mustad learned of one of Hollomon's hooks—the Keep–On hook—which Hollomon designed and sold out of his store in Hemphill, Texas. In the hope of increasing its share of the bass fishing market, Arne Forsberg, the president of O. Mustad & Sons (Mustad), contacted Hollomon about entering into an agreement regarding this hook. Mustad wanted Hollomon to seek patent protection for his hook and Hollomon contacted Harold Dutton, a patent attorney, for assistance in obtaining a patent for the Keep–On hook. On March 1, 1993, Dutton filed for Hollomon a patent application covering the Keep–On hook.

On March 15, 1993, the parties entered into an agreement, drafted by Mustad, whereby Mustad would pay Hollomon a royalty of five percent on Mustad's sales of the Keep–On hook for the exclusive right to produce and market the hook described in Hollomon's patent application. Hollomon also granted Mustad a right of first refusal on any future fish hook products that he developed. The agreement contained no confidentiality agreement and had no set duration. Either party could terminate the agreement for any reason by giving six months notice.

After entering the 1993 agreement, Mustad began producing and selling the Keep–On hook under the name Needle Power Lock. Also in 1993, Hollomon submitted several hooks to Mustad for review, including the Triple Grip hook, the Carolina Rig Jig hook, and the Fin–Acky hook. Mustad agreed to market these hooks under the terms of the 1993 agreement and began paying Hollomon a five percent royalty on its sales of these hooks. At some point during 1993, Mustad contacted Dutton, Hollomon's patent attorney,

about doing some work for it. Mustad knew at this time that Dutton worked for Hollomon because the 1993 agreement required Mustad to pay Hollomon's patent attorney up front and then subtract this fee from Hollomon's royalties. Hollomon, however, did not know of Dutton's representation of Mustad at this time. Both parties claim they asked Dutton to register a trademark for the Triple Grip hook in their name. Dutton registered the trademark in Mustad's name. Dutton did register a trademark in the Fin–Acky name for Hollomon and filed a patent application on February 1, 1995, for the Triple Grip hook for him. Dutton also amended the Keep–On hook's patent application to include the Carolina Rig Jig and filed a Patent Cooperation Treaty application in an effort to obtain U.S. and foreign patent rights for Hollomon.

In 1994, the parties entered into a supplemental agreement, which added a term of duration to their earlier arrangement. By this time, Mustad had invested a substantial sum of money in Hollomon's hook designs and wanted to ensure it had an adequate amount of time to recoup its investment. Mustad had Dutton, Hollomon's patent attorney, draft the 1994 agreement. Under the supplement, Hollomon would get five percent royalties for five years on his designs sold by Mustad and Mustad would receive the exclusive right to use the designs for five years. All designs that Mustad chose to market were to be submitted to Hollomon's patent attorney for a determination of the hook's patentability. The 1994 agreement, like the 1993 agreement, did not contain a confidentiality agreement.

At the end of 1994, Hollomon submitted another design to Mustad called the Mega–Bite. The parties agreed not to attempt to patent this design. Again both parties claim they asked Dutton to obtain

a trademark on the Mega–Bite name for them. Dutton registered the mark in Mustad's name. Mustad paid the five percent royalty to Hollomon for this hook as well.

On April 7, 1997, Hollomon terminated the 1993 and 1994 agreements. In his termination letter to Mustad, Hollomon set forth the dates on which he believed each license period would end for each hook manufactured by Mustad. Mustad continued to pay royalties on each hook until the date stated in Hollomon's letter. After this date, Mustad kept selling the hooks, but without paying Hollomon the five percent royalty. At the time Hollomon terminated the agreements, he still had two outstanding patent applications, but in continuing to manufacture and sell the hooks after the agreement had ended, Mustad violated no patent rights belonging to Hollomon because no patent had been issued for any of the hooks Mustad continued to sell. Additionally, other manufacturers made and sold hooks similar to the Triple Grip and Mega–Bite without paying royalties to Hollomon and continue to do so without paying royalties to Hollomon. The plaintiff admits that other manufacturers could easily copy one of his hooks in about twenty minutes. Hollomon has not brought suit against any of these other manufacturers.

On August 6, 1998, Dutton, on behalf of Mustad, sent Hollomon a "cease and desist" letter asking Hollomon to stop marketing a hook with the name Mega–Bite on it because Mustad owned the trademark on this name.

In May of 2000, Hollomon filed this lawsuit and he amended his complaint on April 2, 2001, to allege the following four causes of action: breach of contract, breach of fiduciary duty, trade secret misappropriation, and trademark infringement. On December 17, 2001, Mustad moved for summary judgment on all four of Hollomon's claims.

### Summary Judgment Standard

A court should grant summary judgment when "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it might affect the outcome of a case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue exists when, in the context of the entire record, a reasonable fact-finder could return a verdict for the non-movant. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 885–86, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). The court must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment. *Eastman Kodak v. Image Technical Services,* 504 U.S. 451, 478, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Lemelle v. Universal Mfg. Corp.,* 18 F.3d 1268, 1272 (5th Cir. 1994). However, this favorable presumption for the non-movant exists only when the non-movant presents an actual controversy of fact. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994).

### Hollomon's Breach of Contract Claim

Hollomon argues Mustad breached the agreements by continuing to manufacture and sell his hook designs after the termination of the agreements and by selling his hooks without paying him a royalty. Hollomon contends that by terminating the agreements, he removed Mustad's authority to manufacture and sell the hooks. Hollomon further contends that nothing in the two agreements gave Mustad the right to sell his hooks without paying him a royalty. While Hollomon argues that

Mustad may no longer manufacture or sell his hooks, he acknowledges that other companies have been and continue to manufacture and sell his hooks without paying him a royalty. To decide what the agreements dictate should occur upon their terminations or completions, the court turns to the language of the agreements.

When interpreting a contract, a court must give effect to the intentions of the parties as expressed in the contract. *Gracia v. RC Cola–7–Up Bottling Co.*, 667 S.W.2d 517, 520 (Tex.1984). Thus, the court must first decide whether the contract is ambiguous; the decision about whether a contract is ambiguous is a question of law. *Sage Street Assoc. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993). If a written instrument is worded so that a court may properly give it a certain or definite legal meaning or interpretation, it is not ambiguous. *R & P Enter. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 519 (Tex.1980). A provision or term in a contract will be held ambiguous only when, after applying rules of construction, the court concludes that the contract is capable of two different but reasonable meanings. *Id.; Nguyen Ngoc Giao v. Smith & Lamm, P.C.*, 714 S.W.2d 144, 147 (Tex.App.—Houston [1st Dist.] 1986, no writ). If the court concludes that a contract is ambiguous, rendition of summary judgment is improper because the interpretation of the instrument becomes a fact issue. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983).

Extrinsic evidence is only admissible to interpret a contract after the court decides that the contract is ambiguous. *Harris v. Rowe*, 593 S.W.2d 303, 307 (Tex. 1979). However, evidence of the circumstances surrounding the execution of a contract is always admissible. *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731–32 (Tex.1981).

After examining the language of the two agreements and the circumstances surrounding their execution, the court finds that these agreements are not ambiguous. In construing these agreements, the court's primary concern is to ascertain the true intentions of the parties as expressed in the instruments. *GTE Mobilnet of South Texas Ltd. v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 289 (Tex.App.—Houston [1st Dist.] 1997, writ denied).

Both parties agree that the contracts are unambiguous, but in so arguing, both sides believe the contracts' plain meanings lead to opposite results. The fact that the parties proffer divergent meanings for the language of the contracts does not render them ambiguous. *Pierce v. Benefit Trust Life Ins. Co.*, 784 S.W.2d 516, 518 (Tex.App.—Amarillo 1990, writ denied). Hollomon argues that through the agreements he granted Mustad the right to manufacture and sell his hooks and in exchange Mustad promised to pay him a five percent royalty on each sale. As such, Hollomon argues that Mustad lost the right to manufacture and sell the hooks upon the termination or completion of the agreements. In the alternative, Hollomon contends that the terms of the contracts required Mustad to pay him a royalty on sales made after the completion of the agreements.

Mustad, on the other hand, argues that the agreements required it to pay Hollomon a five percent royalty in exchange for the exclusive right to manufacture and sell his hooks. Mustad contends that the agreements contemplate Hollomon acquiring patent protection, and as such, this exclusive right would become valuable to it when Hollomon attained patent protection. Mustad thus argues that upon the termination or completion of the agreements it lost the exclusive right to manufacture and sell Hollomon's hooks,

but that nothing in the agreements required it to refrain from manufacturing and selling unpatented products after the termination or completion of the agreements or to pay royalties on such sales. For the following reasons, the court agrees with Mustad's interpretation of the plain meaning of the contracts.

The 1993 agreement plainly states in paragraph 1 that "Hollomon grants Mustad the exclusive right to produce and market the fish hooks described in the above mentioned patent application." Likewise, paragraph 2 of the 1994 agreement, which discusses potential future hooks submitted by Hollomon that Mustad chose to market, states that "Hollomon agrees to grant Mustad an exclusive license to make, use and sell [the hooks]." Thus, at the termination or completion of the agreements, Mustad lost this exclusive right and/or exclusive license granted to him by the contracts. That is, Hollomon was no longer obligated to refrain from granting a license to other manufacturers. The contracts say nothing about Mustad promising to forgo manufacturing or selling hooks after the termination or completion of the agreements. As a result of this loss, at the termination or completion of the agreements, Mustad became like every other company in the world with respect to these hooks, but because Hollomon never received patent protection for his hooks, being like every other company in the world is not such a bad situation for Mustad. Because Hollomon never received patent protection for his hook designs and because the contracts do not explicitly state that upon their terminations or completions Mustad must refrain from manufacturing and selling these hooks, nothing

prevents Mustad from producing and marketing these hooks after the completion of the agreements.

Similarly, nothing in these contracts compelled Mustad to pay Hollomon a royalty for the sale of hooks after the termination or completion of the agreements. The 1993 agreement states in paragraph 2 that Mustad will "remunerate" Hollomon with a five percent royalty on sales. Reading the contract as a whole, this remuneration is clearly for the exclusive right granted by Hollomon in paragraph 1. Likewise, paragraph 3 of the 1994 agreement states that "[u]pon the grant of license as provided in Paragraph 2 Mustad agrees to pay Hollomon a royalty of 5%." This language demonstrates that the five percent royalty was in exchange for the exclusive right to produce and sell the hooks. After Hollomon terminated Mustad's exclusive right, Mustad could not be forced to pay Hollomon a five percent royalty because the royalty was given quid pro quo for the exclusive license.[1] As such, nothing in the agreements obligated Mustad to pay Hollomon a royalty on the sale of unpatented products after the completion of the agreements, and thus Mustad's sale, as such, did not breach the agreements.

Hollomon attempts to counter the interpretation that Mustad may continue manufacturing and selling the hooks after the completion of the agreements by asking why the 1993 agreement would contain a termination clause and a provision allowing Mustad to liquidate its inventory, if Mustad retained an unfettered right to continue to market and sell his hooks after the termination of the agreement. Similarly,

---

1. The agreements also gave Mustad a right of first refusal on any fish hook products Hollomon might develop in the future, so technically the royalty was given as remuneration for this right as well, but when the contracts were completed, Hollomon no longer had to submit new designs to Mustad. Thus, the royalty may have been given in exchange for more than just the exclusive right, but after the completion of the agreements, Mustad received neither the exclusive license nor the right of first refusal.

Hollomon asks why the 1994 agreement would add a period of duration to the contract, if Mustad could still sell his hooks after the agreed duration had ended.

 Looking at these clauses in isolation, Hollomon's questions appear valid. In construing a contract, however, all provisions must be considered with reference to the entire instrument in order to insure that each provision is interpreted in harmony with the true intentions of the parties as expressed by the whole contract. *Coker*, 650 S.W.2d at 393. Thus, the court cannot look at one provision in a contract in isolation, but rather must look at each provision as it relates to the entire agreement. *Myers v. Gulf Coast Minerals Management Corp.*, 361 S.W.2d 193, 196 (Tex.1962).

The key to interpreting provisions within the 1993 and 1994 agreements is to understand that these contracts were written in contemplation of Hollomon attempting to acquire patent protection for his hooks. Neither party disputes that the agreements contemplate patent protection. *See Mustad's Motion for Summary Judgment* at 12 and *Hollomon's Opposition to Defendant's Motion for Summary Judgment* at 12. Furthermore, and more importantly, the face of the instruments demonstrate that patent protection is contemplated. *See Intratex Gas Co. v. Puckett*, 886 S.W.2d 274, 277–78 (Tex.App.—El Paso 1994, no writ) ("In construing an unambiguous contract, the parties' intent must be taken from the agreement itself, not the parties' present interpretation, and the court must enforce the unambiguous contract as written.").

Looking first at the 1993 agreement, it is clear that the plain language of this contract contemplated the potential acquisition of patent protection for Hollomon's hooks. First, the introductory paragraph states that "Hollomon has submitted a patent application for these products." This statement demonstrates that patent rights may subsequently exist and are being sought for the products discussed in this contract. Second, paragraph 1 of this agreement states "Hollomon grants Mustad the exclusive right to produce and market the fish hooks described in the above mentioned patent application." Not only does this language incorporate the patent application into the contract, but it also gives Mustad the exclusive right to make and sell these hooks. BLACK'S LAW DICTIONARY defines "exclusive right" as: "One which only the grantee thereof can exercise, and from which all others are prohibited or shut out." BLACK'S LAW DICTIONARY 565 (6th ed.1990). What makes this an exclusive right or one which only the grantee can exercise? A patent. *See* 35 U.S.C. § 271 (discussing patent infringement); *Reeves Brothers, Inc. v. U.S. Laminating Corp.*, 282 F.Supp. 118, 134 (E.D.N.Y.1968) (stating that "[a] patent has been repeatedly defined as a franchise granting the right to exclude everyone from making, using or selling the patented invention without the permission of the patentee."). As is evidenced by the fact that other manufacturers made and sold these hooks, nothing about the right Hollomon granted Mustad is exclusive without the acquisition of a patent, which would give Hollomon the power to exclude others from making, using, and selling his hooks.

Reading the termination and liquidation clauses in the context of the entire agreement, it becomes clear that Mustad did not possess the unfettered right to continue to manufacture and sell the hooks after the termination of the agreement and that the termination and liquidation provisions serve an important purpose in this agreement. If Hollomon received a patent on his hooks, the 1993 contract gave him the power to terminate the agreement and Mustad would have had no automatic right to continue to manufacture or sell the pro-

tected hooks. Without the liquidation clause, if Hollomon received a patent and terminated the agreement, Mustad would be forced to immediately stop its sale of the protected hooks. Under such a scenario, however, the liquidation clause allows Mustad to sell off its inventory of these products. Other companies making these hooks would be stuck with this inventory because they did not have Hollomon's permission to liquidate their inventory. Because Hollomon never received a patent for his hooks, Mustad could continue to manufacture and sell these hooks and, read in context with the entire contract, the termination and liquidation clauses do nothing to contradict this finding.

Likewise, when examining the 1994 agreement as a whole, the duration provision in the 1994 agreement does not conflict with Mustad possessing the right to continue manufacturing and selling Hollomon's hooks after the completion of the 1994 agreement. Under the 1993 agreement, Hollomon could terminate the contract by giving six months written notice. Thus, it allowed for a situation where the day after Hollomon received his patent, he could terminate the contract and Mustad would have been paying the five percent royalty for an exclusive right that it would enjoy for a relatively short period of time. The addition of the durational term prevents this situation from occurring. The durational clause clearly states that the parties recognize that both Hollomon and Mustad are shouldering economic burdens by taking part in this agreement and that to insure each party has a satisfactory amount of time to recover their costs, the exclusive license must have an adequate lifetime. The clause continues by setting the minimum lifetime of any license granted under either of the two agreements at five years. Again, without this provision, if Hollomon had been granted a patent, he could have terminated Mustad's exclusive

license with six months notice; but with this provision, Hollomon promises Mustad not to terminate the grant of the license for at least five years. The fact that Hollomon never received patent protection for his hooks allows Mustad, like it allows other hook manufacturers, to continue to produce and market these hooks even after the completion of the 1994 agreement. Reading the contract as a whole, this continuation does not contradict the durational clause contained within the 1994 agreement.

To interpret the contracts as to obligate Mustad to stop manufacturing and selling Hollomon's hooks at the termination or completion of the agreements regardless of whether a patent was issued, as Hollomon argues this court should interpret them, would require the court to add terms to already unambiguous contracts. The court would also be forced to add terms to the agreements to allow Hollomon to collect royalties on sales of unpatented products after the termination or completion of the agreements. As currently written, nothing in these contracts imposes a duty upon Mustad to stop producing and selling these hooks at their terminations or completions or to pay royalties on sales after their terminations or completions. The court is unable and unwilling to rewrite the contracts so as to prevent Mustad from manufacturing Hollomon's unprotected hooks or to compel the payment of royalties after the completion of the agreements. *Borders v. KRLB, Inc.*, 727 S.W.2d 357, 359 (Tex.App.—Amarillo 1987, writ refused n.r.e.) ("In interpreting a contract, the ultimate restraint is that a court cannot, through the construction process, make a new contract for the parties, one they did not make.").

Because nothing in either the 1993 or 1994 agreements obligated Mustad to refrain from producing and selling Hollo-

mon's hooks, nor compelled payment of royalties after their completions, the court finds that Mustad did not breach either agreement by its continued manufacturing and selling of the hooks without the payment of royalties after the agreements came to an end. As such, the court grants Mustad's motion for summary judgment with respect to Hollomon's breach of contract claim.

### Hollomon's Breach of Fiduciary Duty Claim

In his Second Amended Complaint, Hollomon contends the terms of the 1993 and 1994 agreements created a joint venture relationship between the two parties and that Mustad's actions breached the fiduciary duties owed Hollomon by virtue of this business relationship. Because the court finds no joint venture existed between the parties, Mustad owed Hollomon no fiduciary duty.

In Texas, the requirements for a joint venture are: 1) a community of interest; 2) an agreement to share profits; 3) an agreement to share losses; and 4) a mutual right of control or management of the enterprise. *Ayco Development Corp. v. G.E.T. Service Co.*, 616 S.W.2d 184, 186 (Tex.1981). Unless all four elements are shown to exist, no joint venture has been created. *See Coastal Plains Development Corp. v. Micrea, Inc.*, 572 S.W.2d 285, 287 (Tex.1978) (calling these elements "essential"). The court finds that no agreement to share profits existed between these parties, and therefore the parties did not enter into a joint venture. The court also doubts whether an agreement to share losses or whether a mutual right of control of the enterprise existed, but because the summary judgment evidence clearly indicates neither party agreed to share profits, the court need not analyze these elements.

Hollomon argues that the 1993 and 1994 agreements called for a sharing of profits because the agreements entitled him to a five percent royalty on Mustad's sales of the hooks. The court finds this argument unpersuasive.

The five percent royalty on Mustad's sales is not an agreement to share profits. The two parties agreed that Hollomon would receive a five percent royalty on Mustad's sales, not its profits. Hollomon received his five percent payment regardless of whether there were any profits. Hollomon's deposition testimony on this point is enlightening:

Q. (By Mr. Hasley) Okay. Let me ask you a question just—under this agreement, you receive a five percent royalty on sales of the products?

A. Right, uh-huh.

Q. Now, what happens if Mustad loses money on these products? Did you have to pay in any of the losses?

A. That wasn't my problem.

Q. Okay. So, you weren't really sharing profits or losses, you were just receiving a direct royalty?

A. If they sold it, they sent me five percent of what they received.

Q. Okay. And so you got your five percent whether Mustad made money, or lost money, is that true?

A. I don't know.

Q. Well, if—according to the agreement, if Mustad sold a product, whether they made money on that product or lost money on that product, you'd receive a royalty?

A. I had no knowledge of whether they lost money or not.

Q. That's—I understand that, but I guess what I'm saying is, according to the agreement between you, you receive a five percent royalty—

A. If they sold the hook. It didn't have anything in that contract whether they made money or not, if they sold the hook.

*Hollomon Depo.* p. 1531.25 to p. 1541.24. As this testimony demonstrates, Hollomon did not know or even care if Mustad earned a profit on these hooks because he got his five percent royalty as long as Mustad sold a hook. According to Hollomon's testimony, the contracts did not condition his five percent payment on the earning of a profit. If Mustad made or lost money, "[t]hat wasn't [his] problem" because he still received his payment. Thus, Hollomon's own testimony establishes that the parties did not share profits.[2]

Because these agreements merely set Hollomon's payment at five percent of Mustad's sales and because they do not contemplate the parties sharing profits, one of the elements of a joint venture is missing, and thus no joint venture existed between the parties. As such, Mustad could not have breached fiduciary duties owed Hollomon and the court grants Mustad's motion for summary judgment with regard to Hollomon's breach of fiduciary duty claim.

### Hollomon's Trade Secrets Claim

■ Hollomon has also brought a claim for misappropriation of trade secrets against Mustad for continuing to sell his hook designs after the termination of the license period without paying him royalties. In order to establish a misappropriation of a trade secret under Texas law, Hollomon must show that 1) a trade secret existed; 2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and 3) Mustad used the trade secret without authorization from Hollomon. *Gaia*

*Techs., Inc. v. Recycled Prods. Corp.,* 175 F.3d 365, 376 (5th Cir.1999). Because the court finds no confidential relationship existed between the parties, the court grants Mustad's motion for summary judgment with respect to Hollomon's misappropriation of trade secrets claim.

■ In determining whether a confidential relationship exists, this court must examine the entire record. *Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 777 (1958). A duty of confidentiality is not implied, as a matter of law, from the licensor-licensee relationship between the parties. *Id.* "Although an express contractual provision is not required to establish a duty of confidentiality, the absence of an agreement restricting disclosure of information is a factor the court may consider." *Daily International Sales Corp. v. Eastman Whipstock, Inc.,* 662 S.W.2d 60, 63 (Tex.App.—Houston [1st Dist.] 1983, no writ). Other factors include the nature and extent of security precautions taken by the possessor of the trade secret to keep the information from the general public, and the degree to which the information has been placed in the public domain by voluntary disclosure. *Rimes v. Club Corp. of America,* 542 S.W.2d 909, 913–14 (Tex.Civ.App.—Dallas 1976, writ ref'd n.r.e.); *Furr's Inc. v. United Specialty Advertising Co.,* 385 S.W.2d 456, 459 (Tex.Civ.App.—El Paso 1964, writ ref'd n.r.e.); *Lamons Metal Gasket Co. v. Traylor,* 361 S.W.2d 211, 212–13 (Tex.Civ.App.—Houston 1962, writ ref'd n.r.e.).

Neither the 1993 nor the 1994 agreements contain a confidentiality provision.

---

**2.** Hollomon attempts to create a genuine issue of material fact for this element and his joint venture claim generally by filing a declaration along with his papers in opposition to Mustad's motion for summary judgment, which states: "During the course of my relationship with Mustad I invested large sums of money for patent and trademark protection on my hooks, and shared in profits and losses under our agreements." The Fifth Circuit, however, "does not allow a party to defeat a motion for summary judgment by using an affidavit that impeaches, without explanation, sworn testimony." *SWS Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 494 (5th Cir.1996).

This fact is clear from the face of the contracts and is undisputed by the parties to this suit. Hollomon correctly points out that Texas courts have found confidential relationships even in the absence of explicit confidentiality agreements. *See, e.g., Huffines,* 314 S.W.2d at 770. While the lack of such an agreement is a strike against Hollomon, the court must examine the entire record to decide whether a confidential relationship existed between the parties. *Id.* at 777. Looking at the entire record, however, the court finds that the strikes against Hollomon continue to arise.

First, Hollomon has produced no summary judgment evidence that he asked Mustad to keep confidential these designs or that he informed Mustad that he submitted these designs to it in confidence. *See Furr's,* 385 S.W.2d at 459–60 ("Confidential relationship is a two-way street: if the disclosure is made in confidence, the 'disclosee' should be aware of it. He must know that the secret is being revealed to him on the condition he is under a duty to keep it."). Second, Hollomon's deposition testimony shows that he did not believe he needed to keep the hook designs secret:

Q. I guess what I'm wondering is, is that—was it your expectation that you would need to keep your new—the newly-developed products a secret from anyone except Mustad?

A. No, sir, it wasn't my understanding.

Q. So, was it your understanding, then, that when you developed a new product, that you could begin selling it in your own shop?

A. That was my understanding.

Q. You could sell it in your own shop prior to giving it to Mustad?

A. Yes, I could.

*Hollomon Depo.* p. 1471.25 to p. 1481.11. Thus, Hollomon understood his relationship with Mustad to allow him to show and sell his hooks to others before submitting them to Mustad. This is important because Hollomon's counsel at oral arguments stated that these fish hooks could be knocked off in about twenty minutes by someone who knew how to copy hooks. Finally, Hollomon admitted showing the hooks to others for testing purposes without first entering into non-disclosure agreements with these people. *Hollomon Depo.* p. 149 1.2–18.

The summary judgment evidence fails to show Hollomon took any precautions to keep these hook designs away from the general public and out of the public domain. This is especially important in light of the fact that knock-offs could so easily be made. Furthermore, Hollomon voluntarily showed these hooks to others and admitted that his understanding of his relationship with Mustad did not require him to keep the hooks secret. Finally, the court has not been presented with any evidence that Hollomon informed Mustad that his designs were being disclosed in confidence. Under these circumstances, the court finds no confidential relationship existed between Hollomon and Mustad that obligated Mustad to keep the hooks secret. As such, Mustad did not *misappropriate trade secrets and Mustad's mo*tion for summary judgment with regard to Hollomon's misappropriation of trade secrets claim is granted.

**Hollomon's Trademark Infringement Claim**

■ Hollomon's Second Amended Complaint also contains a claim for trademark infringement. Hollomon contends that he withdrew permission to use the Fin–Acky mark from Mustad as of the date of the expiration of the hook's license period. Mustad counters by arguing that this claim should be barred by laches and the doctrine of acquiescence. While Hollomon's complaint appears to argue that Mustad began infringing the mark in 1994, during oral arguments for this motion,

counsel for Hollomon stated that the 1994 date in the complaint was meant as the time Mustad began using the mark, not when it began infringing the mark. Hollomon's counsel argued that he gave the defendant permission to use the mark until the licensing period ended and withdrew this permission as of the license's expiration.

The court finds genuine issues of fact exist as to whether Hollomon granted Mustad the right to use the mark from 1994 to 1998 and whether Hollomon subsequently withdrew his permission in 1998. The court also notes, however, that in order to avoid the laches defense, the period of infringement must be limited to after the expiration of the licensing agreement under Hollomon's theory that he withdrew permission at the end of the licensing period. With this caveat, the court denies Mustad's motion for summary judgment with regard to Hollomon's trademark infringement claim.

### Conclusion

For the preceding reasons, it is, therefore,

ORDERED, that Mustad's Motion for Summary Judgment is hereby GRANTED in PART and DENIED in PART. It is further,

ORDERED, that Hollomon's breach of contract, breach of fiduciary duty, and misappropriation of trade secret claims are hereby DISMISSED with PREJUDICE. It is further,

ORDERED, that Mustad's Motion for Summary Judgment is DENIED in PART with respect to Hollomon's trademark infringement claim with the caveat that the infringement period is limited to after the expiration of the Fin–Acky license.