TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-02-00405-CV






GTE Southwest, Incorporated d/b/a Verizon Southwest/MCI Communications
Corporation and MCI WorldCom Communications, Inc., Appellants


v.


Public Utility Commission of Texas; MCI Communications Corporation; and MCI
WorldCom Communications, Inc./GTE Southwest, Incorporated d/b/a

Verizon Southwest, Inc., Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT

NO. GN1-00159, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING





O P I N I O N 




 GTE Southwest Incorporated d/b/a Verizon Southwest ("Verizon") sought judicial
review of a final order issued by the Public Utility Commission of Texas (the "Commission") that
interpreted and enforced an interconnection agreement. MCI Communications Corporation and MCI
WorldCom Communications, Inc. ("WorldCom") intervened in the suit to defend the order and to
request the district court to award interest accruing from the date of the order. The district court
affirmed the order, but awarded interest only from the date of its judgment. In two issues, Verizon
asks this Court to reverse the district court's judgment because: (1) the Commission lacked
jurisdiction to enter the order; and (2) even if the Commission had jurisdiction, it erred as a matter
of law in interpreting the agreement. WorldCom brings a cross-appeal complaining of the district
court's refusal to award WorldCom interest from the date of the Commission's order. We will
affirm the judgment of the district court in all respects.


BACKGROUND


 This case concerns an interconnection agreement between Verizon, an incumbent
local telephone exchange company, and WorldCom, a new entrant in the local exchange
telecommunications market. (1) The interconnection of networks between telecommunications carriers
makes it possible for customers of different carriers to call one another. Thus, interconnection
agreements are crucial for new entrants to compete in the local telephone market. Both federal and
state laws have been enacted to promote competition in local telephone markets and to require
interconnection and procedures for negotiating and enforcing such agreements. See Federal
Telecommunications Act (FTA) of 1996, 47 U.S.C.A. §§ 251-252 (West 2001); Public Utility
Regulatory Act (PURA), Tex. Util. Code Ann. §§ 60.121-.128 (West 1998).

 In September 1996, Verizon and WorldCom entered into an interim interconnection
agreement. The interim agreement contemplated a permanent agreement, which had not been
completed by the time this dispute arose. Although the parties failed to seek the Commission's
approval of their interim agreement, and thereby did not comply with federal procedures set forth
in section 252(e) of the FTA, they operated under the agreement for three years. See 47 U.S.C.A.
§ 252(e). (2) But when a dispute over terms of the agreement arose, this failure to seek Commission
approval became problematic.

 In May 1999, WorldCom filed its first complaint with the Commission in Docket No.
20870, alleging that Verizon had breached the interim agreement by failing to comply with
reciprocal compensation provisions for terminating local traffic. Reciprocal compensation
arrangements establish the terms by which local exchange carriers ("LECs") compensate each other
for the use of the other's networks. See 47 U.S.C.A. § 251(b)(5), (c)(1) (West 2001). When an
LEC's customer places a local call to a customer of another LEC, the LEC whose customer initiated
the call compensates the receiving LEC for transporting and "terminating" the call through its
network. Id. WorldCom complained that Verizon refused to compensate for the termination of
Verizon's customers' calls to Internet Service Providers ("ISPs") that are WorldCom customers. The
Commission dismissed the complaint without prejudice, ruling that it lacked jurisdiction to consider
a dispute arising under an agreement that it had not approved. See Tex. Pub. Util. Comm'n,
Arbitration Award (Dismissing Complaint), Docket No. 20870 (June 18, 1999).

 In July 1999, WorldCom initiated a second proceeding in Docket No. 21088, seeking
the Commission's approval of the interconnection agreement after the fact, presumably so the
Commission could then assert its jurisdiction to resolve the parties' contractual dispute. Verizon
refused to join the application for approval, taking the position that the agreement was no longer in
the public interest. Verizon asked the Commission to dismiss WorldCom's application, insisting
that Verizon's joinder was necessary before the Commission could approve the agreement. The
administrative law judge certified the following question to the Commission: Can the Commission
approve an agreement, even if a signatory party does not support its approval?

 The Commission considered the unique circumstances of the dispute: an agreement
that was supported by both parties when it was signed; an agreement that was intended to govern the
parties' dealings for an interim period until a final agreement was reached, but that had in fact been
in effect for three years; and the parties' inadvertent failure to seek the Commission's approval for
the agreement because it "fell between the proverbial cracks." Tex. Pub. Util. Comm'n, Order on
Certified Issue, Docket No. 21088 (Oct. 28, 1999) (citing Affidavit of Joseph A. Lazzara, the
Verizon consultant responsible for negotiating the interim agreement in the summer of 1996). The
Commission declined to answer the certified question but reversed its earlier decision that it lacked
jurisdiction to settle this dispute. Referring to the unique facts outlined above, the Commission
found that although the parties had failed to comply with the FTA's requirement that the
Commission approve the interim agreement, the Commission nevertheless had jurisdiction to resolve
the dispute under state law because PURA does not require the Commission's prior approval of an
agreement to vest the Commission with authority to review it. See Tex. Pub. Util. Comm'n, Order
on Certified Issue, Docket No. 21088 (Oct. 28, 1999). Having determined that it could assert its
jurisdiction under state law without first approving the agreement, the Commission then dismissed
as moot WorldCom's application for approval of the interim agreement. See Tex. Pub. Util.
Comm'n, Order, Docket No. 21088 (Jan. 13, 2000).

 Verizon sought judicial review of the Commission's action, and the trial court
affirmed its order. This Court reviewed that judgment in GTE Southwest, Inc. v. Public Utility
Commission, 37 S.W.3d 546 (Tex. App.--Austin 2001, no pet.). The contractual dispute, including
the issue of the Commission's authority to hear the dispute under state law, was not before us in that
cause. Rather, we limited our review to the dismissal of WorldCom's application for approval of
the interim agreement. Id. at 548. We held that because the Commission granted the relief that
Verizon sought by dismissing WorldCom's application, Verizon was not an aggrieved party and was
therefore not entitled to seek judicial review of the Commission's final order in Docket No. 21088. 
Id.

 Meanwhile, WorldCom filed its third complaint, again seeking reciprocal
compensation for termination of ISP calls under the interim agreement. Asserting its authority under
state law, (3) the Commission referred the dispute to the State Office of Administrative Hearings
(SOAH), see Tex. Gov't Code Ann. § 2003.049(e) (West 2000), and identified three issues to be
addressed: (1) whether the terms of the interim agreement make any distinction regarding traffic
destined for ISP customers; (2) whether ISP traffic otherwise conforms to the term "local traffic" in
the interim agreement; and (3) what amount of compensation WorldCom is due, if any, for the
termination of ISP traffic. (4) See Tex. Pub. Util. Comm'n, Preliminary Order, Docket No. 21706
(April 12, 2000).

 The Commission affirmed the proposal for decision (PFD), including the findings of
fact and conclusions of law, issued by the ALJ. The Commission's final order concluded that ISP-bound traffic is compensable under the reciprocal compensation provisions of the interim agreement,
and ordered Verizon to compensate WorldCom approximately ten million dollars for the termination
of traffic which originated on Verizon's network destined for WorldCom's ISP customers during the
period from October 1996 to October 14, 1999. See Tex. Pub. Util. Comm'n, Order, Docket No.
21706 (Oct. 4, 2000). Verizon filed suit in the district court for judicial review. WorldCom
intervened and counterclaimed, requesting the district court to enforce the order and award interest
accruing from the date of the order. The district court affirmed and enforced the order, and awarded
WorldCom interest from the date of its judgment but not from the date of the Commission's order. 
This appeal and cross-appeal followed.


VERIZON'S APPEAL


The Commission's Jurisdiction to Interpret and Enforce the Interim Agreement

 In its first issue, Verizon contends that the district court erred by affirming the
Commission's assertion of jurisdiction over "issues related to the interconnection of
telecommunications providers" contained in Subchapter G of PURA. See Tex. Util. Code Ann.
§§ 60.121-.128 (West 1998). According to Verizon, the Commission's dispute resolution power
under PURA does not give the Commission jurisdiction over post-agreement disputes, and therefore
does not allow the Commission to interpret and enforce the interim agreement because here the
dispute arose "after an agreement has been negotiated and implemented by the parties." And even
if PURA does give the Commission the power to interpret and enforce interconnection agreements,
Verizon argues, it would not apply here because it pertains only to resolution of disputes under
approved agreements and it is undisputed that the interim agreement has never been approved. 
Appellees respond that various provisions of PURA, especially sections 60.122 and 60.126,
expressly authorize the Commission to exercise jurisdiction over this matter and "to enforce
interconnection agreements regardless of whether or not they have been submitted to the
Commission for review and approval." See id. §§ 60.122, .126. We will hold that the Commission
had jurisdiction to interpret and enforce the unapproved interim agreement in this case pursuant to
its dispute resolution authority under section 60.126 of PURA specifically because the Commission
resolved a dispute filed by a party to an interconnection negotiation that was ongoing and not yet
successful. See id. § 60.126.

 Section 60.126 provides that the Commission "may resolve a dispute filed
by a party to a negotiation under Section 60.125(a)." Id. Section 60.125(a) requires that
"[t]elecommunications providers shall negotiate network interconnectivity, charges, and terms." Id.
§ 60.125(a). According to Verizon, the Commission improperly took jurisdiction pursuant to these
provisions because the only reading of section 60.126 that is consistent with its text is that the
provision gives the Commission authority to facilitate the negotiation of interconnection agreements
by allowing it to resolve disputes that arise during the negotiation process. Verizon contends that
because the interim interconnection agreement was a fully executed contract constituting
successfully negotiated interconnection terms, the Commission improperly relied on section 60.126
to resolve a dispute that arose after Verizon and WorldCom had negotiated the interim
interconnection agreement. We disagree that the interim agreement represented the successful
culmination of the parties' interconnection negotiations. Rather, we favor the appellee's position
that "the interconnection between Verizon and WorldCom was a matter of ongoing negotiation when
the Commission took jurisdiction."

 In reviewing the Commission's interpretation of its dispute resolution authority
pursuant to PURA, we must emphasize that the Commission exercises the jurisdiction and powers
conferred by PURA, see Tex. Util. Code Ann. § 12.001, and is the agency charged with the
enforcement of that statute. In cases involving agency decision-making, we apply a deferential
standard of review. See Southwestern Bell Tel. Co. v. Pub. Util. Comm'n, 79 S.W.3d 226, 228 (Tex.
App.--Austin 2002, no pet.). When an agency is charged with enforcement of a statute, we give
serious consideration to the agency's construction, as long as the interpretation is reasonable and
does not contradict the statute's plain language. Id. at 228; see also Nabisco v. Rylander, 992
S.W.2d 678, 681 (Tex. App.--Austin 1999, pet. denied); Texas Citrus Exch. v. Sharp, 955 S.W.2d
164, 168 (Tex. App.--Austin 1997, no pet.).

 The Commission's explanation for its jurisdiction in Docket No. 21088 is instructive. 
The Commission reviewed the interim agreement and found that "it is unclear whether the parties
intended it to serve as a negotiated interconnection agreement within the meaning of the FTA." Tex.
Pub. Util. Comm'n, Order on Certified Issue, Docket No. 21088 (Oct. 28, 1999). The Commission
then referred to Chapter 60, Subchapter G of PURA, specifically sections 60.125(a) and 60.126. See
Tex. Util. Code Ann. §§ 60.125(a), .126. In light of these provisions, the Commission concluded:


Viewing the Interim Agreement as a step in the negotiation of a final interconnection
agreement between [WorldCom] and [Verizon], the Commission . . . can resolve any
dispute arising under the Interim Agreement. The Commission further concludes that
the period for any such dispute is limited to the period commencing September 30,
1996 and ending October 14, 1999.



Tex. Pub. Util. Comm'n, Order on Certified Issue, Docket No. 21088 (Oct. 28, 1999).

 Several factors convince us that the Commission correctly labeled the interim
agreement as merely a "step" towards an interconnection agreement between Verizon and
WorldCom. First, the agreement itself is entitled the "MFS/GTE Interim Texas Co-Carrier
Agreement." The word "interim" has been defined as "done, made, or occurring for an intervening
time." Black's Law Dictionary 819 (7th ed. 1999). "Interim" is also synonymous with "temporary"
or "provisional." Id. The language of the agreement itself strongly suggests that interconnection
arrangements between Verizon and WorldCom remained in negotiations. The temporary nature of
the agreement is made explicit in the opening paragraphs of its first section (entitled "Recitals &
Principles"). The first paragraph establishes that "the Parties intend to negotiate a permanent
agreement pursuant to Section 251 of the Telecommunications Act of 1996, but desire to enter into
an interim interconnection agreement pending completion of the permanent agreement under federal
law." (Emphasis added.) The second paragraph states that the interim agreement "is not intended
by either Party to constitute compliance with the requirements of Section 251(c), of the
Telecommunications Act of 1996." The third paragraph states that the parties "have agreed on
interim interconnection terms and conditions." (Emphasis added.)

 Verizon argues that, notwithstanding this language, section 60.126 gives the
Commission jurisdiction to resolve a dispute concerning the interim interconnection agreement only
if the dispute arises during that agreement's negotiation. According to Verizon, because the interim
agreement has been "successfully negotiated" and a dispute arisen over the meaning of its terms, any
authority the PUC may have to resolve the dispute "can arise only from the rules governing dispute
resolution of agreements approved under Section 60.125(b) or the FTA." Verizon reads section
60.126 too narrowly. That provision makes no mention of a negotiated agreement; it merely refers
to a "negotiation." See Tex. Util. Code Ann. § 60.126. Section 60.125(a) also makes no mention
of agreements, but merely says that parties "shall negotiate network interconnectivity, charges, and
terms." Id. § 60.125(a). Verizon has presented us with no authority for the proposition that parties
cease to be engaged in a negotiation when they have executed an interim agreement. Verizon's
reliance on section 60.125(b) of PURA is therefore also misplaced. That section states: "If
interconnectivity, charges, and terms are successfully negotiated, the commission shall approve the
interconnection rates." Id. § 60.125(b) (West 1998) (emphasis added). Here, only an interim
agreement had been "successfully negotiated," and in it the parties explicitly only agreed on "interim
interconnection terms and conditions" pending the completion of a permanent interconnection
agreement. (Emphasis added.) The language of the interim agreement therefore belies Verizon's
suggestion that interconnectivity arrangements had been "successfully negotiated" at the time of its
adoption.

 The parties' conduct as reflected in the record also suggests that interconnection
negotiations were ongoing when WorldCom brought its dispute with Verizon before the
Commission. WorldCom and Verizon began negotiating interconnection terms and conditions in
1996. Those negotiations stalled, and WorldCom petitioned the Commission to arbitrate certain
issues. See 47 U.S.C.A. § 252(b) (West 2001). WorldCom withdrew its petition on August 12,
1996, when the parties executed the interim agreement that purportedly resolved the open issues until
the parties could finalize a permanent agreement. After executing the interim agreement, the parties 
continued to attempt to negotiate a permanent agreement. The parties had operated under the interim
agreement for nearly three years when negotiations broke down and WorldCom filed this complaint
with the Commission. Since then, the parties have resumed their attempt to successfully negotiate
a permanent interconnection agreement. Overall, the parties' actions indicate that the interim
agreement was essentially a stage in the negotiation process meant to address certain issues while
the parties continued negotiating interconnection terms and conditions. Thus, we conclude that at
the time WorldCom filed its complaint, the parties' interconnection negotiations were ongoing for
the purposes of the Commission's dispute resolution power under section 60.126. 

 Furthermore, there is no merit to Verizon's position that applying section 60.126 of
PURA to resolve this dispute circumvents the state and federal requirements that the Commission
review and approve interconnection agreements before enforcing them. Verizon seems principally
concerned that carriers will now "'successfully negotiate' the terms of an 'interim' interconnection
agreement, fail to request review or approval of that agreement, and simply have the [Commission]
enforce it by calling it a 'step' in the negotiation of some future contract." Verizon does not have
a valid concern because when WorldCom filed its complaint with the Commission, the parties could
not demonstrate "successfully negotiated" interconnection terms and conditions. We read section
60.126 to apply only to disputes where negotiations are ongoing; a permanent agreement with
"successfully negotiated" interconnection rates must be approved before being interpreted and
enforced by the Commission. See Tex. Util. Code Ann. § 60.125(b). Therefore, we reject the
Commission's position that PURA generally allows the enforcement of all interconnection
agreements regardless of whether they have been submitted to the Commission for review and
approval. (5) Only "interim" interconnection agreements in which interconnection has not yet been
"successfully negotiated" can be interpreted and enforced pursuant to the Commission's dispute
resolution power under PURA section 60.126 when it has not yet been approved. 

 When the Commission first asserted jurisdiction over WorldCom's complaint, it
emphasized that its authority over the dispute was specific to the "unique circumstances involved
here" because previously "disputes related to interconnection agreements have arisen in the context
of agreements executed and approved pursuant to federal law" and therefore "have been resolved
pursuant to the FTA and Commission rules implementing the FTA." Tex. Pub. Util. Comm'n,
Order on Certified Issue, Docket No. 21088 (Oct. 28, 1999). Although we conclude that the
Commission acted within its jurisdiction when it took the unusual step of interpreting and enforcing
an unapproved interconnection agreement, we are confident that our holding will be limited to the
unique circumstances where the parties fail to submit an "interim" agreement for approval and delay
in executing a permanent interconnection agreement. (6) As the Commission points out, "Verizon's
alleged concern about hordes of unfiled agreements is simply groundless. Seven years have elapsed
since Verizon forgot to file the instant agreement. In that time, not a single other telecom provider
has come to the Commission with a similar issue." We agree with the appellees that the
Commission's decision to interpret and enforce it in this particular case does not threaten the normal
process by which interconnection agreements are reviewed and approved.

 To summarize, Verizon and WorldCom are telecommunication providers that, as
required by section 60.125(a), had entered into negotiations over "interconnectivity, charges, and
terms." Tex. Util. Code Ann. § 60.125(a). While the broader interconnection negotiation was still
ongoing, WorldCom--a party to that negotiation--had a dispute with Verizon which was filed with
the Commission. See id. § 60.126. The Commission chose to resolve the dispute pursuant to its
PURA authority, even though it had not approved the interim agreement. However, as evidenced
by the language of the interim agreement and the parties' conduct, "interconnectivity, charges, and
terms" had not been "successfully negotiated" so as to implicate the approval requirement of section
60.125(b). See id. § 60.125(b). Thus, based on the plain language of the applicable provisions, and
giving serious consideration to the Commission's construction of sections 60.125(a) and 60.126, we
hold that on these facts the Commission's decision to resolve the dispute pursuant to PURA was not
improper or beyond the Commission's statutory authority. See Southwestern Bell, 79 S.W.3d at 228. 
Accordingly, we overrule Verizon's first issue.


The Commission's Interpretation of the Agreement

 The Commission found that ISP-bound traffic is "local traffic" under the interim
agreement (hereinafter "the Agreement") and therefore that "ISP-bound traffic is compensable under
the reciprocal compensation provisions of the Interim Agreement." The Commission considered
several factors, including the language of the Agreement; the manner in which Verizon's customers
accessed ISPs; the technical nature of ISP-bound calls; the billing rates and billing techniques
utilized by Verizon; and the common industry practice and understanding towards ISP-bound calls
and billing. In its second issue, Verizon contends that the district court erred in affirming the
Commission's interpretation of the Agreement because that interpretation (1) violates established
rules of Texas contract law and (2) conflicts with the requirements of federal law.


Texas Contract Law


 We will first consider whether the Commission properly interpreted the Agreement
as requiring reciprocal compensation for calls to ISPs. The Agreement itself provides that Texas law
governs its interpretation; in addition, it has been held that state contract law principles govern the
questions of interpretation of interconnection agreements and enforcement of their provisions. See
Southwestern Bell Tel. Co. v. Pub. Util. Comm'n, 208 F.3d 475, 485 (5th Cir. 2000); see also
Southwestern Bell Tel. Co. v. Brooks Fiber Communications of Okla., Inc., 235 F.3d 493, 499 (10th
Cir. 2000). Thus, the Commission required reciprocal compensation for calls to ISPs not because
federal law requires such compensation, but because the Agreement, as interpreted under Texas state
law, requires it.

 Under Texas law, the primary concern in construing a written contract is to ascertain
the true intent of the parties as expressed in the instrument. National Union Fire Ins. Co. of
Pittsburgh, Pennsylvania v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995). If a written contract
is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. Id.;
Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). Although parol evidence relating to the parties'
intent is not admissible for the purpose of creating an ambiguity, the contract may be read in light
of the surrounding circumstances to determine whether an ambiguity exists. Cardwell v. Sicola-Cardwell, 978 S.W.2d 722, 727 (Tex. App.--Austin 1998, pet. denied). A contract is ambiguous
only if, after applying appropriate rules of construction, it is subject to two or more reasonable
interpretations. Id. Whether a contract is ambiguous is a question of law for a court to decide by
looking at the contract as a whole, in light of the circumstances present when the parties entered into
the contract. National Union, 907 S.W.2d at 520; Coker, 650 S.W.2d at 394.

 Verizon contends that several provisions contained in the Agreement, in combination
with other relevant circumstances, create an ambiguity as to the parties' intent concerning whether
ISP-bound calls are "local traffic" subject to reciprocal compensation. The Agreement requires the
payment of reciprocal compensation for "local traffic," but does not specifically define that term. 
It simply requires the parties to "reciprocally terminate POTS calls originating on each others'
networks" and to compensate, "[f]or the termination of local traffic," in an "equal, identical and
reciprocal rate of $.009 per minute." POTS (Plain Old Telephone Service) traffic is defined in the
Agreement to include "local traffic (including mandatory EAS) as defined in [Verizon]'s tariff . . . ."
(Emphasis added.) In fact, the specific term "local traffic" is nowhere defined in the tariff. 
However, the tariff does define the term "local service," which is "exchange service available in a
particular exchange for communication throughout the exchange area and to establish toll
connections." (7) After reviewing this language, we agree with the Commission that


nothing in the Interim Agreement . . . requires the parties and the Commission to treat
ISP-bound traffic differently from any other traffic designated as local in terms of
reciprocal compensation between [WorldCom] and [Verizon]. While ISP-bound
traffic is not mentioned in the Interim Agreement, reciprocal compensation under the
Interim Agreement . . . applies to local traffic.



Although the Agreement does not require reciprocal compensation for calls to ISPs, it does not
expressly exclude calls to ISPs from "local traffic" so that the parties would be required to treat ISP-bound traffic differently from any other traffic designated as local.

 We are thus satisfied that the relevant portion of the Agreement, considering the
contract as a whole and the surrounding circumstances at the time it was executed, can only be
reasonably interpreted to include ISP-bound traffic within "local traffic." See National Union, 907
S.W.2d at 520; Cardwell, 978 S.W.2d at 727 ("To determine whether a contract is ambiguous, we
must look at the contract as a whole in light of the circumstances present when the parties made the
agreement.") (citing Friendswood Dev. Co. v. McDade & Co., 926 S.W.2d 280, 282 (Tex. 1996)). 
In this case, the Commission properly relied on its expertise and prior experience in interpreting the
relevant terms of interconnection agreements to determine the standard industry meaning of the
terms "local traffic" and "POTS" at the time the Agreement was entered into. 

 Verizon's contention that the Commission erroneously found the Agreement to
unambiguously include ISP-bound calls within the meaning of "local traffic" essentially constitutes
a substantial evidence attack on the Commission's fact findings. In a substantial evidence review,
we first determine whether the evidence as a whole is such that reasonable minds could have reached
the conclusion the agency must have reached in order to take the disputed action. See Nucor Steel
v. Public Util. Comm'n of Tex., 26 S.W.3d 742, 748 (Tex. App.--Austin 2000, pet. denied). The
test is not whether the agency made the correct conclusion but whether some reasonable basis exists
in the record to support the agency's action. Id. We may not substitute our judgment for that of the
agency, and we are prohibited from substituting our judgment as to the weight of the evidence on
questions committed to agency discretion. Id. Here, the Commission considered the following
evidence:


 Verizon's customers (end-users) access their ISP by dialing a 7- or 10-digit local
number, which is generally stored in the customer's computer. 


 ISP-bound calls act like any other local call from the customer's perspective,
from the standpoint of the switching functions performed by Verizon, and from
the standpoint of the switching functions that are performed by any other carrier
involved in handling the call.


 Verizon provides exchange services to its end-user customers within what its
tariff describes as the "exchange area" typically at flat-rate charges. From the
standpoint of this local service, there is no difference between a typical local
exchange call and a typical dial access connection to an Internet information
destination; both are provided at a flat rate.


 Local calls are billed at the Interim Agreement rate of $.009 per minute of use.


 The NPA-NXX summaries also contain Verizon's Originated Customer
Numbers (OCNs). From this information, Verizon is able to compare the local
calling scope of each NXX (which is determined by Verizon's own local tariffs)
with the physical location of WorldCom's switches. Thus, Verizon is able to
ascertain from the NPA-NXX level data that the calls are local calls.


 It is common industry practice to use records in the billing process that have
been summarized to the NPA-NXX level. WorldCom followed the industry
practice of providing data by NPA-NXX summary.



See Tex. Pub. Util. Comm'n, Order, Docket No. 21706 (Oct. 4, 2000). Applying the appropriate
deferential standard of review, we conclude that the evidence in the record reasonably supports the
Commission's decision that at the time they executed the Agreement, Verizon and WorldCom
treated ISP-bound calls as local traffic.

 In addition, we are convinced that the Commission considered ample evidence that
in 1996, when this interim agreement and similar interconnection agreements were being negotiated,
the telecommunications industry as a whole treated ISP-bound calls as terminating locally. For
example, a 1996 report by the Federal Communications Commission (FCC) defined "termination,"
for purposes of section 251(b)(5), as "the switching of traffic that is subject to section 251(b)(5) at
the terminating carrier's end office switch (or equivalent facility) and delivery of that traffic from
that switch to the called party's premises." Implementation of the Local Competition Provisions in
the Telecommunications Act of 1996, First Report and Order, 11 FCC Rcd 15 (1996), aff'd in part,
vacated in part on other grounds, Iowa Utils. Bd. v. FCC, 120 F.3d 753 (8th Cir. 1997). Here, the
ISPs are WorldCom's customers, making WorldCom the terminating carrier. "Termination"
therefore occurs when WorldCom switches the call at its facility and delivers the call to "the called
party's premises," which is the ISP's local facility. The call can therefore be said to "terminate"
locally at the ISP's premises. See Southwestern Bell, 208 F.3d at 486. Also, the United States Court
of Appeals for the Fifth Circuit recognized that the FCC has "heretofore embraced a custom of
treating calls to ISPs as though they were local, terminating within the same local exchange network"
and that agreements like the one at issue here "had been negotiated in the 'context of this
Commission's longstanding policy of treating this traffic as local.'" Id. (citing Implementation of
the Local Competition Provisions in the Telecommunications Act of 1996, Inter-Carrier
Compensation for ISP-Bound Traffic, 14 FCC Rcd 3689 (1999)). (8)

 Verizon objects that the above evidence is not "mere 'surrounding circumstances'
evidence," but is "instead extrinsic evidence that may not be admitted unless the contract is first
determined to be ambiguous." Although extrinsic evidence is commonly used to show the intent of
parties, or custom and usage in the industry, when contracts are deemed ambiguous, see, e.g.,
Monesson v. Champion Int'l Corp., 546 S.W.2d 631, 637 (Tex. App.--Tyler 1976, writ ref'd n.r.e.),
it is also clear that even with unambiguous contracts courts may "consider the commercial context
of the transaction." Intratex Gas Co. v. Puckett, 886 S.W.2d 274, 278 (Tex. App.--El Paso 1994,
no writ). To elaborate on the point: "[Contracts] should be construed and given effect in terms of
their environment at the time of execution. By environment, we mean the ordinary terms, customs
and usages then in effect as these are evidence of the intent of the parties." Id. (citing Atwood v.
Rodman, 355 S.W.2d 206, 216 (Tex. Civ. App.--El Paso 1962, writ ref'd n.r.e.)); see also
Southwestern Bell, 208 F.3d at 486 ("The parties obviously agreed that "terminate" would mean
whatever the telecommunications industry took it to mean at the time they signed the agreements,
i.e., in 1996 and 1997.") (citing Intratex Gas, 886 S.W.2d at 278).

 The Commission's consideration of evidence regarding the actual physical nature of
ISP-bound calls and the state of the industry at the time the Agreement was executed are
circumstances that serve merely as "an aid in the construction of the contract's language." KMI
Cont'l Offshore Prod. Co. v. ACF Petroleum Co., 746 S.W.2d 238, 241 (Tex. App.--Houston [1st
Dist.] 1987, writ denied). This differs from a consideration of "the parties' statements of what they
intended the contract to mean," which is prohibited when construing unambiguous contracts. Id. 
Therefore, the Commission properly excluded Verizon's self-serving testimony regarding Verizon's
intent when entering into the Agreement. (9) If it had been the intent of the parties to exclude ISP-bound traffic from the Agreement's reciprocal compensation provisions, it would have been simple
to provide as much. The Agreement's failure to make a distinction between calls to ISPs and other
local traffic, coupled with the technical and industry-norm circumstances existing at the time the
Agreement was executed, leads us to conclude that the parties, including Verizon, viewed ISP-bound
traffic to be local and intended that traffic to be covered by the reciprocal compensation provision
of the Agreement. We hold that the Commission correctly interpreted the Agreement according to
Texas law.


Federal Law


 We must now consider whether the Commission's interpretation of the Agreement
contravenes federal law. Verizon cites the FCC's recent decision, In the Matter of Starpower
Communications, 17 F.C.C. Rcd 6873 (April 8, 2002) ("Starpower"), to argue that the Commission's
rationale to support its interpretation "cannot survive as a matter of binding federal law." Verizon
contends that the FCC's analysis of two interconnection agreements between Starpower and Verizon
Virginia ("Verizon Virginia agreements") undermines the Commission's reliance on its prior
determinations--as well as decisions by other state commissions--as a basis for finding that the
parties' reciprocal compensation obligations include ISP-bound traffic. According to Verizon, "the
FCC has directly held that the very cases upon which the Commission relied below are incorrect." 
We disagree.

 Although the FCC concluded that the Verizon Virginia agreements did not obligate
Verizon Virginia to pay reciprocal compensation for ISP-bound traffic, it was specifically because
those agreements expressly referenced and incorporated the FCC's "historic reliance on an 'end-to-end' analysis of traffic for determining the traffic's jurisdictional nature." Id. at 6891, ¶ 41. Here,
it is undisputed that the "end-to-end" jurisdictional language appearing in the Verizon Virginia
agreements does not appear in the Agreement at issue. The FCC did not "find dispositive the many
state regulatory commission decisions . . . holding that ISP-bound traffic is subject to reciprocal
compensation" merely because "none of these decisions specifically construes the contractual
language at issue in this case, which . . . makes the jurisdictional nature of traffic determinative of
whether it constitutes compensable 'Local Traffic.'" Id. at 6890, ¶ 39. The FCC's interpretation of
the Verizon Virginia agreements has no bearing on this case.

 Furthermore, the FCC's interpretation in Starpower of a third interconnection
agreement--the Starpower-Verizon South agreement ("Verizon South agreement")--supports the
Commission's decision in this case. The FCC found that the Verizon South agreement obligated
reciprocal compensation for the delivery of ISP-bound traffic because the definition of compensable
"local traffic" is derived from Verizon's Virginia tariff. Id. at 6892, ¶ 44. Therefore, "whatever calls
Verizon South bills to its customers as local calls under the Tariff must be compensable local calls
under the Starpower-Verizon South Agreement." Id. at 6894, ¶ 49. Similarly, here the Commission
made a factual finding that Verizon rates and bills its customers for a local call pursuant to the tariff
when the customers call ISPs using telephone numbers associated with the customers' local calling
area. This finding is supported by evidence contained in the record. See Nucor Steel, 26 S.W.3d at
748-49. Verizon argues that its Texas tariff does not establish the scope of the parties' reciprocal
compensation obligations because, unlike the Virginia tariff in Starpower, the Texas tariff defines
"local service" to include traditional long-distance voice calls that are not subject to reciprocal
compensation under the Agreement. However, because the crucial inquiry under both the Virginia
and Texas tariffs is whether customers' calls to ISPs are treated as local, we disregard this distinction
and conclude that the FCC's interpretation of the Verizon South agreement does not undermine the
Commission's interpretation of the Agreement.

 We also reject Verizon's assertion that FCC precedent makes clear that "Internet-bound calls are, and always have been, interstate, interexchange calls that terminate on the World
Wide Web," and that there is thus a "federal presumption" against reciprocal compensation for calls
to ISPs. (Emphasis added.) The FCC has applied its so-called "end-to-end" analysis to find that
calls to ISPs are non-local and not within the scope of section 251(b)(5)'s provision for reciprocal
compensation. See In the Matter of Implementation of the Local Competition Provisions in the
Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic, 14 FCC Rcd
3689, 3690, ¶ 1 (1999) ("Declaratory Order") (citing 47 U.S.C.A. § 251(b)(5)). (10) But the FCC also
held that telecommunications providers are controlled by interconnection agreements that include
ISP-bound traffic in their reciprocal compensation provisions. Id.; see also Southwestern Bell, 208
F.3d at 478. "Taking a hands-off approach, the FCC announced that it will not interfere with state
commission determinations of whether reciprocal compensation provisions of interconnection
agreements apply to ISP-bound traffic." Southwestern Bell, 208 F.3d at 478.

 Although the FCC has now definitively ruled that ISP-bound traffic is not subject to
reciprocal compensation arrangements, it ordered that its ruling be prospective in application, to be
applied only "as carriers renegotiate expired or expiring interconnection agreements." See
Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,
Intercarrier Compensation for ISP-Bound Traffic, 16 FCC Rcd 9151, ¶ 82 (2001) ("Remand
Order"). These FCC rulings have no effect on this Agreement, which covers the period from
October 1996 through October 1999. (11) Thus, having held that the Commission correctly interpreted
the Agreement under principles of Texas law to require reciprocal compensation for ISP-bound
traffic, we further hold that the Commission's interpretation and enforcement of the Agreement does
not in any way conflict with the FTA or recent FCC rulings dealing with reciprocal compensation
for ISP-bound traffic. We overrule Verizon's second issue.


WORLDCOM'S CROSS-APPEAL


 In its final order, the Commission ruled that the Agreement requires the parties to pay
each other "reciprocal compensation" for the exchange of calls to ISPs. See Tex. Pub. Util.
Comm'n, Order, Docket No. 21706 (Oct. 4, 2000). In a Compliance proceeding, the Commission
confirmed that Verizon owed WorldCom reciprocal compensation payments in the amount of
$9,898,113.28. See Notice of Approval of Compliance Calculations, Docket No. 23072 (April 13,
2001). Verizon challenged the Commission's order in the district court. WorldCom counterclaimed,
including a request that the district court award interest accruing from the date of the order, October
4, 2000. The district court affirmed the Commission's order and awarded WorldCom interest from
the date of its judgment, see Tex. Fin. Code Ann. §§ 304.001, .003-.006 (West Supp. 2003), but
denied the request for interest from the date of the Commission's order. 

 According to WorldCom, the judgment awarding damages for breach of contract was
the Commission's October 4, 2000 order, and thus it is entitled to interest from the date of the
Commission's order, not just from the district court's judgment. We disagree. WorldCom relies on
provisions of the finance code which expressly limit the award of postjudgment interest to a "money
judgment of a court of this state." Id. (12) (Emphasis added.) WorldCom cites language from this
Court in Robertson County v. Wymola, where we stated that "every valid judgment bears post-judgment interest under the law." 17 S.W.3d 334, 344 (Tex. App.--Austin 2000, pet. denied).
However, that case concerned a valid court judgment, not an administrative order. Id. Because
WorldCom provides us with no authority for the proposition that an administrative award of
compensation bears interest from the date of the order, we overrule its issue on cross-appeal.


CONCLUSION


 For the reasons set forth above, we overrule Verizon's issues on appeal. We also
overrule WorldCom's issue on cross-appeal. We affirm the judgment of the district court in all
respects.



 

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed: March 20, 2003

1. When the interim interconnection agreement was negotiated and executed, and throughout
the parties' early disputes, the parties were called GTE and MFS. Prior to this appeal being filed,
however, both changed their names. GTE became Verizon and MFS became MCI WorldCom. In
their briefing, the parties refer to themselves by their current names; we will do the same. 
2. The FTA requires that "[a]ny interconnection agreement adopted by negotiation or
arbitration shall be submitted for approval to the State commission. A State commission to which
an agreement is submitted shall approve or reject the agreement, with written findings as to any
deficiencies." 47 U.S.C.A. § 252(e)(1) (West 2001).
3. Because of the conclusions previously reached in the order on certified issues in Docket
No. 21088, the Commission specifically directed that the administrative law judge not address
"whether the Interim Agreement is a valid agreement or is an agreement in the public interest" nor
"whether the Commission has jurisdiction over the Interim Agreement or has jurisdiction over this
dispute resolution." See Tex. Pub. Util. Comm'n, Preliminary Order, Docket No. 21706 (April 12,
2000). 
4. In addressing this issue, the administrative law judge was to determine the appropriate
means for identifying ISP-bound traffic subject to such compensation.
5. The Commission contends that its authority under the FTA is irrelevant to whether it has
jurisdiction to interpret and enforce interconnection agreements pursuant to its authority under
PURA. The Commission relies on section 60.122 of PURA to argue that its "jurisdiction under
PURA is unfettered by a requirement that the [Commission] first approve an agreement before
interpreting it." Section 60.122 states: "The commission has exclusive jurisdiction to determine
rates and terms for interconnection for a holder of a certificate of convenience and necessity, a
certificate of operating authority, or a service provider certificate of operating authority." Tex. Util.
Code Ann. § 60.122 (West 1998). Because we hold that the Commission's power to interpret and
enforce the interim interconnection agreement in this case is based on its dispute resolution authority
in section 60.126, we decline to consider whether the language of section 60.122 encompasses the
broad adjudicative power necessary to interpret and enforce interconnection agreements as a general
matter.
6. Here, it is undisputed that Verizon had the responsibility to submit the interim agreement
to the Commission for approval. Furthermore, it is not likely that a telecommunication provider will
in the future do what Verizon did in the instant case: operate from an interim agreement which it
failed to submit for approval, and then later oppose approval when that agreement is submitted to
the Commission for its review.
7. The tariff defines "exchange" as a "telephone service consisting of one or more central
office areas which provides for service within a specified area known as the "Exchange Area." The
tariff defines "exchange area" as the "area within which the Telephone Company will furnish
complete telephone service at the exchange rates applicable within that area." 
8. As further evidence that the industry commonly considered ISP-bound traffic to be "local
traffic," we note that, by the end of 1996, five State commissions had already ruled that modem calls
to ISPs are subject to reciprocal compensation. See Southwestern Bell Tel. Co. v. Public Util.
Comm'n, 208 F.3d 475, 487 (5th Cir. 2000). 
9. According to Verizon, if "this Court finds the Interim Agreement to be ambiguous . . . the
[Commission] erred by excluding relevant extrinsic evidence offered by Verizon--specifically,
testimony by Howard Lee Jones . . . concerning Verizon's intent when entering the contract." 
Because we find the relevant portions of the Agreement to unambiguously provide reciprocal
compensation for "local traffic," including calls to ISPs, we need not further consider this argument. 

10. In Bell Atlantic Telephone Co. v. FCC, 206 F.3d 1, 8 (D.C. Cir. 2000), the Declaratory
Order was vacated and remanded because it failed to supply a real explanation for its decision to treat
end-to-end analysis as controlling. According to the D.C. Circuit court, "[h]owever sound the end-to-end analysis may be for jurisdictional purposes, the Commission has not explained why viewing
these linked telecommunications as continuous works for purposes of reciprocal compensation." 
Id. at 7.
11. To illustrate the purely prospective application of the FCC's rulings on ISP-bound traffic,
we note that in Starpower, decided after the Remand Order, the FCC interpreted an interconnection
agreement to require reciprocal compensation for ISP-bound traffic and reaffirmed that the Remand
Order did not apply to existing agreements like the one at issue here. In the Matter of Starpower
Communications, 17 F.C.C. Rcd 6873, 6882, ¶ 23 (April 8, 2002); see also Verizon Md. v. RCN
Telecom Services, No. S-99-2061, 2003 U.S. Dist. LEXIS 3579, at *43-47 (D. Md. March 5, 2003).
12. For example, section 304.001 states: "A money judgment of a court in this state must
specify the postjudgment interest rate applicable to that judgment." Tex. Fin. Code Ann. § 304.001
(West Supp. 2003). Section 304.005 states in part that "postjudgment interest on a money judgment
of a court in this state accrues during the period beginning on the date the judgment is rendered and
ending on the date the judgment is satisfied." Id. § 304.005(a) (West Supp. 2003).