# United States Court of Appeals
# for the Fifth Circuit

---

No. 23-50321
CONSOLIDATED WITH
No. 23-50446

---

United States Court of Appeals
Fifth Circuit

**FILED**

August 15, 2024

Lyle W. Cayce
Clerk

MISSION PHARMACAL COMPANY, *a Texas Corporation*,

*Plaintiff—Appellant*,

*versus*

MOLECULAR BIOLOGICALS, INCORPORATED, *a Delaware Corporation*,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC Nos. 5:20-CV-1454, 5:20-CV-1454

---

Before ELROD, GRAVES, *Circuit Judges*, and ASHE, *District Judge*.[*]

JENNIFER WALKER ELROD, *Circuit Judge*:

In this contract dispute between Molecular Biologicals, a pharmaceutical start-up, and Mission Pharmacal, its third-party logistics

---

[*] United States District Judge for the Eastern District of Louisiana, sitting by designation.

provider, the parties contest whether Molecular is required to reimburse Mission for credits that Mission issued to customers when products were returned. After a bench trial, the district court determined that no breach of contract occurred because the contract did not contain any provisions requiring reimbursement. We REVERSE.

I

Molecular is a pharmaceutical start-up founded by Dr. Arturo Martinez, a physician, and his brother, Armando Martinez, a businessman. Molecular sells Keragel, a product that helps wounds and sores heal faster. Mission is an established drug manufacturer and distributor. In September 2017, Mission and Molecular entered into a Master Service Agreement for Mission to provide third-party logistics services to Molecular. At the time the parties entered into the contract, Mission had established relationships with the "Big Three" pharmaceutical wholesalers: AmerisourceBergen, Cardinal Health, and McKesson Corp.

Under the contract, Mission provided a variety of distribution services for Molecular's sales to wholesalers, including order processing and return processing. Wholesalers ordered products through Mission and paid Mission. Mission remitted the proceeds, less the contractually agreed upon fees (around 2% of the sale amount), to Molecular. In 2018, Mission sold $2,387,704 of Molecular's products to the Big Three. Due to a lack of sales, the Big Three returned $1,780,027 worth of Molecular's products to Mission in 2019. Mission issued credit to the wholesalers as part of the return. The contract referred to this process as the "chargeback" process.

Molecular initially agreed that it was obligated to reimburse Mission for the value of the chargebacks. Mission also claims that Molecular reimbursed Mission for smaller chargeback amounts prior to the events giving rise to this case. Molecular asked for more time to issue the reimbursement while

it obtained financing. Only when Mission filed a lawsuit seeking to compel reimbursement did Molecular claim that it had no obligation to reimburse Mission.

Mission sued Molecular, alleging breach of contract for unpaid service fees and failure to reimburse for credits that Mission issued to wholesalers on Molecular's behalf. Mission also asserted an alternative claim for *quantum meruit*, arguing that if the contract did not require reimbursement for the credits Mission issued to wholesalers, then Molecular received undue benefit when Mission issued them. Mission also argued that, should it prevail on either of its claims, it is entitled to attorney's fees under the contract and Texas law. Molecular brought counterclaims for breach of contract and conversion based on Mission's destruction of some of the returned products. The parties filed cross motions for summary judgment, both of which the district court denied.

At a bench trial before the district court, the parties presented evidence regarding industry custom for chargebacks, though they disagree about what that evidence says. Industry experts testified that when chargebacks are provided as a third-party logistics service, the manufacturer typically reimburses the logistics provider for wholesaler returns. Molecular's CEO, Kevin Combs, testified that manufacturers typically had separate contracts with wholesalers. He claimed that the agreement between Mission and Molecular, in which only Mission had contracts with the wholesalers, was unusual.

The parties also presented parol evidence about how they believed chargebacks were to be handled under their contract. Multiple witnesses testified that both parties evinced their understanding that Molecular was responsible for the cost of returns during the implementation meetings for the contract. Most notably, Molecular's founder and principal Arturo

Martinez confirmed that the implementation meetings contained discussions indicating that Molecular would be responsible for the cost of returns. Mission's CEO, Tom Dooley, testified that Mission intended for the return process to mirror the sales process, meaning that Mission would handle the logistics and bookkeeping, while Molecular would bear the financial risk (and upside) of the transactions.

In e-mails from Arturo Martinez to Mission, Martinez acknowledged that Molecular needed to reimburse Mission for the returns and would do so when it obtained financing. There was also evidence that when converting Molecular from a Texas limited liability company to a Delaware corporation, Martinez listed the amount owed to Mission for returns as a liability on the company's balance sheet.

The district court determined at the end of the bench trial that Mission should recover for unpaid service fees but not for reimbursements to wholesalers (on either a breach of contract theory or a *quantum meruit* theory). The district court reasoned that the contract was silent as to which party bore the costs of reimbursement, so the contract "unambiguously does not require Molecular Biologicals to reimburse Mission Pharmacal for returns." Because the district court determined that the contract was unambiguous, the district court did not "consider evidence of industry practices or extrinsic communications" between the parties.

II

We begin with Mission's breach of contract claim. Following a bench trial, we review the district court's determination that the contract was unambiguously silent as to reimbursements *de novo*. *First Am. Bank v. First Am. Transp. Title Ins. Co.*, 759 F.3d 427, 432 (5th Cir. 2014).

Because this is a diversity case, "we apply the substantive law of [Texas to construe the parties' contract] . . . . according to the general

23-50321
c/w No. 23-50446

principles of contract interpretation articulated by the Texas Supreme Court." *McLane Foodservice, Inc. v. Table Rock Rests., L.L.C.*, 736 F.3d 375, 377 (5th Cir. 2013). Under Texas law, Mission must establish "that (1) a valid contract exists; (2) [Mission] performed or tendered performance as contractually required; (3) [Molecular] breached the contract by failing to perform or tender performance as contractually required; and (4) [Mission] sustained damages due to the breach." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). Here, the only question is whether Molecular breached the contract by failing to reimburse Mission for the costs of the credits Mission issued to wholesalers when products were returned.

Mission's claim turns on the term "chargeback," specifically the services included in the phrases "Chargeback management" and "Receipt of Chargebacks."[1] The parties agree that the term chargeback, on its own, refers to credit issued due to a disputed charge or return, meaning it contemplates the issuance of a credit or refund, not just a return. That is important because it means the contract itself contemplates credits being issued to the wholesalers. It undermines the suggestion that Mission

_____

[1] The parties point to four provisions that they claim are relevant. In our view, while each of the provisions provides helpful context, the chargeback provision is the crux of this case. The parties point to: (1) Paragraph 2(a), which states that "[Molecular] appoints Mission as, and Mission accepts appointment as, [Molecular's] exclusive third party logistics distribution agent"; (2) Paragraph 5(f), which states that "Except as may be specifically provided herein, neither of the Parties shall hold itself out as the agent of the other, nor, shall either of the Parties incur any indebtedness or obligation in the name of the other Party"; (3) Paragraph 15(a), which states that "Title to all Products shall remain with [Molecular] at all times under this Agreement"; and (4) the Statement of Work – Third Party Logistics, which is incorporated into the contract and lists "Receipt of Chargebacks" and "Chargeback management" as services Mission will provide as part of the contract.

voluntarily created an obligation to the wholesalers (that otherwise did not exist) by issuing credit.

The fact that the term chargeback contemplates the issuance of a refund raises the question of whether, by agreeing to perform chargeback services, Mission agreed only to process returns on Molecular's behalf or whether it also agreed to assume the financial cost of those returns. The question is akin to whether a travel agent, by offering to plan a trip for a customer, agrees to book the trip or to pay for it as well. The former is the better reading.

Comparing each party's proposed interpretation of the contract is informative. Reading "Chargeback management" to include reimbursement from Molecular makes the returns process mirror the sales process. In both cases, Mission is responsible for logistics like processing orders, shipping the product, and doing the bookkeeping. This logistical role matches the contract's stated general purpose of providing third-party logistics services. It also harmonizes with the contractual provisions stating that Mission acts as Molecular's agent when providing these services, while Molecular retains title to the products at all times. Finally, it is consistent with the fact that Molecular had to approve returns for products that had not yet expired. If Molecular had no financial stake in product returns, the need to approve them becomes unclear.

By contrast, Molecular's proposed interpretation creates numerous inconsistencies in the contract. First, just as the term "Chargeback management" does not explicitly indicate that Molecular will reimburse Mission for the value of the chargebacks, the term "AR Processing"—short for Accounts Receivable Processing—does not clearly indicate that Mission will remit the wholesalers' payments to Molecular. While remittance was clearly central to the parties' agreement, no other provision of the contract

23-50321
c/w No. 23-50446

provides that Mission must do so. In other words, Molecular asks the court to shift the level of specificity required when talking about sales versus when talking about returns. And it claims that the contract treats sales and returns in a highly asymmetrical way. We see no textual basis in the contract for interpreting these symmetric provisions asymmetrically.

Second, nothing about the term "chargeback" indicates that Mission agreed to assume the financial risk of all returns. The upshot of Molecular's argument is that by agreeing to provide "Chargeback management," Mission agreed to assume the financial risk of returns. By its plain meaning, managing chargebacks connotes overseeing the returns process and handling its logistics. Assuming financial responsibility is not a traditional logistics service, and we see nothing in the term's meaning indicating that Mission took on such an obligation.

The district court focused on the lack of an explicit promise that Molecular would reimburse Mission for the cost of the refunds without considering what that interpretation implied about the meaning of the rest of the contract. Nor did the district court consider whether there was a plausible basis for treating the sales process and returns process differently or whether providing chargeback services could plausibly mean assuming the financial risk of returns.[2]

---

[2] The district court also determined that it did not need to consider parol evidence *or* industry custom since it determined that the contract was unambiguous. However, Texas law does not treat parol evidence and industry custom the same way. The consideration of parol evidence is clearly limited to resolving textual ambiguities. *E.g.*, *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) ("An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports."). The permissible use of industry custom is broader. Texas appellate courts have allowed the use of industry custom as a means of *identifying* ambiguity, not just resolving it. *E.g.*, *GTE Sw., Inc. v. Pub. Util. Comm'n*, 102 S.W.3d 282, 295 (Tex. App.—

As Mission persuasively explains, Paragraph 5(f) is not to the contrary. It precludes either party from incurring a debt in the other's name. But processing a return is not incurring a debt. Molecular claims that Mission chose to accept returns and issue credit, so but for Mission's choice nothing would be owed to the wholesalers. But the idea that returns were entirely Mission's choice is inconsistent with the fact that Molecular had to approve certain returns and with the fact that the return process was covered in the contract.

None of this is to say that the plain meaning of the contract adopted leads to implausible results or that a provision, found nowhere in the contract, must be inserted to avoid implausible results. *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained."). Rather, faced with the question of whether the meaning of chargeback services includes reimbursement from Molecular, the fact that one answer leads to a harmonious contract, while the other leads to a dissonant one, is informative in determining the meaning of the term. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) ("We consider the entire writing and

---

Austin 2003). The Supreme Court of Texas has made statements that, though not expressly naming industry custom, suggest it can be used in determining meaning. *E.g.*, *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 765 (Tex. 2018) ("The parol evidence rule does not, however, prohibit courts from considering extrinsic evidence of the facts and circumstances surrounding the contract's execution . . . ."); *id.* ("[W]hether a court is considering if an ambiguity exists or construing the terms of an unambiguous contract, surrounding facts and circumstances can only provide context that elucidates the meaning of the words employed, and nothing else."). We have previously used industry custom to determine the meaning of an unambiguous contractual term when applying Texas law. *Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tex.*, 208 F.3d 475, 486 (5th Cir. 2000).

Nonetheless, our decision here does not rely on industry custom or parol evidence.

attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement.").

We hold that the contract is clear and unambiguous that chargeback services require Mission to process returns and issue credit on Molecular's behalf, not to assume the cost of those returns. Because the returns were made on Molecular's behalf, absent assumption of costs by Mission, Molecular was responsible for the cost of returns. Therefore, Molecular breached the contract by failing to reimburse Mission for the costs of the returns that Mission processed.

Because Mission can recover through breach of contract, we need not address Mission's *quantum meruit* theory of recovery. We do not reach the impact this decision has on the parties' dispute regarding attorney's fees or Molecular's counterclaims.

*    *    *

We REVERSE and REMAND for proceedings consistent with this opinion.